In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 07-1430

SUSANNE ATANUS,

*Plaintiff-Appellant*,

*v.*

STEPHEN A. PERRY, Administrator, GSA,

*Defendant-Appellee*.

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 7512—**Mark R. Filip,** *Judge*.

_____

ARGUED DECEMBER 4, 2007—DECIDED MARCH 17, 2008

_____

Before RIPPLE, MANION and WOOD, *Circuit Judges*.

RIPPLE, *Circuit Judge.* Susanne Atanus filed this action in the district court against her employer, Stephen A. Perry, Administrator of the General Services Administration ("GSA"). Ms. Atanus' complaint alleges that the GSA discriminated against her on the basis of her race, color, religion, gender and national origin, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Her complaint also includes a Title VII retaliation claim and a claim of age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"),

29 U.S.C. § 621 et seq. The district court granted the GSA's motion for summary judgment on all claims. Ms. Atanus timely filed a notice of appeal.

For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A.

Ms. Atanus has predicated her suit against the GSA on four alleged adverse employment actions: a ten-day suspension in December 2002, a letter of instruction issued on January 13, 2003, verbal harassment that occurred on February 13, 2003 and her reassignment to the position of procurement analyst (GS-11) from her previous position of contract specialist (also GS-11).

Ms. Atanus began working as a contract administrator for the GSA in 1984. According to the GSA, Debra Wauchop, who supervised Ms. Atanus from 1990 through early 2002, began noticing problems with Ms. Atanus' work conduct in 1999. On February 1, 1999, Wauchop issued Ms. Atanus a letter of instruction for her obstinate and quarrelsome behavior toward coworkers and supervisors during a meeting. On July 20, 2000, Wauchop issued Ms. Atanus a warning notice for her disrespectful conduct during a lecture given by GSA employees. Less than a year later, in March 2001, Wauchop issued Ms. Atanus a third warning notice for two public verbal confrontations that Ms. Atanus had with a senior GSA employee; the warning notice explained that Ms. Atanus had taken a harsh and disrespectful tone with the senior employee. The

reprimand also referenced an e-mail in which Ms. Atanus had given written instructions akin to an order to a coworker whom she did not supervise. The GSA claims that Ms. Atanus' behavior was of concern because, as a contract specialist, she was required to have extensive communications with contractor representatives and other parties outside the Government.

On June 11, 2001, Wauchop assigned Ms. Atanus to an "unassembled set of duties."[1] The GSA explains that it reassigned her to fill a void left by a recently deceased employee and to maximize Ms. Atanus' contract capabilities while minimizing her contact with others. Ms. Atanus neither complains about this transfer nor questions the GSA's proffered explanation.

In early 2002, Kim Brown, an African-American woman, replaced Wauchop as Ms. Atanus' supervisor. According to the GSA, Brown observed the same problems with Ms. Atanus' conduct as had Wauchop. On July 11, 2002, Brown issued Ms. Atanus a letter of instruction—her fourth agency action—citing Ms. Atanus' failure to follow Federal Acquisition Regulation ("FAR") 4.2,[2] which requires a contract modification to be distributed within ten working days of execution by all parties. The letter

---

[1] The GSA defines this assignment as a group of duties and responsibilities, assembled by management and required to be performed for a specified period of time, that have not been officially described and classified into a formal position description.

[2] The GSA administers Government contracts using the Federal Acquisition Regulations. *See* General Services Administration, *Federal Acquisition Regulations*, http://www.acqnet.gov/FAR/current/pdf/FAR.book.pdf (last visited February 13, 2008).

described two instances when Ms. Atanus had violated this rule and thereby hindered the GSA's ability to monitor contractor performance.

The following month, on August 14, 2002, Brown issued a letter proposing to suspend Ms. Atanus from duty for five days because of Ms. Atanus' disorderly conduct at a meeting on July 16. The suspension letter stated that Ms. Atanus had handled a FOIA request improperly and that she had taken a loud, rude and harsh tone when asked by her team leader to explain her conduct. According to the letter, Ms. Atanus behaved in this fashion until her team leader threatened to contact a federal protective officer for assistance if Ms. Atanus did not return to her desk.

On September 12, 2002, Richard Smith, Brown's superior, telephoned Ms. Atanus and scheduled for 2 p.m. an in-person meeting to discuss the proposed suspension.[3] What happened next is the basis for the first of the four adverse employment actions upon which Ms. Atanus has predicated her case.

Ms. Atanus walked into Smith's office two hours prior to the scheduled start of the meeting. She began discussing the proposed suspension and told Smith that the suspension was not fair and that she did not understand the

_____

[3] During this telephone conversation, Ms. Atanus told Smith that she had done nothing wrong and that she did not need to meet with him in person. Smith told Ms. Atanus that she was required to meet with him. The district court noted in its opinion that Ms. Atanus first had admitted this fact and then clarified that she had asked only if the meeting would be necessary.

charge. Ms. Atanus continued to talk about the suspension for fifteen minutes until Smith told her to leave or he would call federal protective officers.

At 2 p.m., Smith met with Ms. Atanus; Gregory Flores, another GSA supervisor, was present as a witness. Smith gave Ms. Atanus the final decision letter and other paperwork attendant to her suspension. Ms. Atanus began to discuss the suspension. Smith claims that she was becoming agitated, which Ms. Atanus denies. The parties nevertheless agree that Ms. Atanus told Smith that she did not believe Christians would act in this manner. At this point, Smith tried to end the meeting. The parties further agree that, when Smith stated that the meeting was over, Ms. Atanus told Smith that he was the one who should have been suspended because he was not performing his job properly and that she was going to call Smith's superior to reverse his decision.

The following day, at about 10 a.m., Ms. Atanus saw Smith passing through the office and asked if he would see her. She entered his office and again began discussing her suspension. Ms. Atanus told Smith that she was the smartest person in the building, that she worked very hard and that it had not been fair to suspend her. Ms. Atanus continued speaking for fifteen minutes until Smith dismissed her from his office. According to Smith, Ms. Atanus grew extremely agitated, loud and aggressive.

At 11:15 that same morning, Ms. Atanus called Smith to request another meeting; she indicated that she wanted to smooth things over. In his office, Smith advised Ms. Atanus of her right to grieve the suspension. Ms. Atanus admits that she told Smith that she was a person of God and that he would not suspend her if he too was a person of God. Smith, who felt that Ms. Atanus had

become aggressive in approaching his desk, told her that he was offended by her comment and ended the meeting. According to Smith, Ms. Atanus continued the discussion, and she stated that she would not leave the office; he told her that he would call a federal protective officer if she did not return to her work station.

At 2:45 p.m. on the same day, Ms. Atanus returned to Smith's office for a third time. She said that she never had paid attention to the previous letters of reprimand that she had received because nothing had come of them. He told her to return to her work station. Again, Smith told her that he would call a federal protective officer if she did not leave. Smith made a written record of all these events and provided a copy to Brown.

Based upon the information provided by Smith, Brown proposed to suspend Ms. Atanus for ten days for her disorderly conduct toward Smith. On November 19, 2002, Wauchop reviewed Brown's proposed suspension and approved it. The GSA claims that Wauchop relied on the factors set forth in the GSA's discipline manual. Of particular concern to Wauchop, according to the discipline notice, was the fact that Ms. Atanus continued to exhibit the same behavior for which she had received prior disciplinary actions, that she showed no sign of changing and that she had not provided any explanation for her behavior toward Smith.

On December 17, 2002, Ms. Atanus requested that the GSA conduct a desk audit of her work. A desk audit consists of a personnel specialist interviewing an employee and supervisor to obtain information about the difficulty of the employee's work. After this information is obtained, the GSA determines whether the position is classified properly. On January 7, 2003, Brown advised

Ms. Atanus that the GSA did not perform desk audits for employees who were assigned an unassembled set of duties; Ms. Atanus then requested that management assign her to an official position and perform a desk audit. On January 17, 2003, Brown began working with the human resources department to develop a position specifically for Ms. Atanus.

On January 13, 2003, Brown issued Ms. Atanus another letter of instruction, her seventh agency action. In her letter, Brown cited Ms. Atanus' failure to process contract modifications in a timely manner, the same violation for which she previously had received a letter of instruction. Brown, Ms. Atanus and Henderson, Ms. Atanus' team leader, met on February 13, 2003 to discuss this letter of instruction. The parties dispute what took place at this meeting. Ms. Atanus asserts that Brown and Henderson badgered her in a "loud, unprofessional tone." R.37 at 12. She does not expand any further as to what they said. The GSA denies that this took place and claims that it was Ms. Atanus who raised her voice and accused Brown of harassing her.

On March 5, 2003, Ms. Atanus filed a formal complaint of discrimination with the Equal Employment Opportunity Commission ("EEOC"). On April 6, 2003, the GSA assigned Ms. Atanus to the position of procurement analyst. The GSA claims that it was complying with Ms. Atanus' request to be reassigned to an official position so that a desk audit could be performed. This position, consistent with Ms. Atanus' previous positions, was classified at the GS-11 level. Ms. Atanus, however, claims that the GSA first transferred her to the position of contract specialist and then, in retaliation for her EEO complaint, transferred her to the position of procurement analyst.

**B.**

The district court granted the GSA's motion for summary judgment. In setting forth the legal standards for Title VII and ADEA claims, the district court, relying on some of our older cases, stated that the two ways of proving discrimination are through "direct evidence" and "indirect evidence." *Atanus v. Perry*, No. 04 C 07512, 2007 WL 257679, at *3 (N.D. Ill. Jan. 24, 2006). The court determined that Ms. Atanus offered no "direct evidence" of discrimination. It noted that the only evidence that might conceivably be considered direct evidence is her claim that Wauchop allegedly had asked her during a 1996 lunch, "What's your nationality," to which Ms. Atanus replied, "Assyrian." Ms. Atanus alleges that Wauchop had remained silent for the remainder of the meal. The court ruled that this allegation does not constitute direct evidence of discrimination because "it is not anything from which one could infer discriminatory animus without inference or presumption, as precedent requires." *Id.* at *4. It further explained that "Ms. Wauchop is not alleged to have made any derogatory statement about Assyrians, or Catholics, or women, nor did she allegedly express anything that, by implication, could be understood as a negative appraisal of individuals who might fit into such groups." *Id.* Independently, it determined that Wauchop's conduct could not create a genuine issue of material fact because the conduct had occurred five years prior to any of the events at issue in this case.

The district court further determined that Ms. Atanus had not established a prima facie case of discrimination; nor had she presented any evidence of pretext. With regard to the ten-day suspension, the court ruled that

Ms. Atanus had failed to show evidence of similarly situated employees outside of her protected classes who reacted similarly to disciplinary actions but were treated more favorably. It further found that the GSA had offered a legitimate, non-discriminatory explanation for its decision to suspend Ms. Atanus for ten-days—namely, her failure properly to handle the FOIA request and her insubordinate conduct toward Smith—that Ms. Atanus had not rebutted as pretextual.

With regard to the January 13, 2003 letter of instruction, the district court held that Ms. Atanus had not established an adverse employment action. In addition, the court ruled that, even if it were an adverse employment action, Ms. Atanus had failed to identify any similarly situated employees outside her various protected classes who were treated more favorably in similar circumstances; nor, the court added, had Ms. Atanus established that the reason for issuing the letter—her mishandling of contract modifications—was pretextual.

The court then addressed Ms. Atanus' claim that Brown and Henderson had verbally harassed her during the February 13, 2003 meeting. Although noting that it was unclear from Ms. Atanus' complaint how she intended to frame her claim on this issue, the court explained that it would consider her claim as one for "hostile work environment." It determined that Ms. Atanus' evidence, which was limited to her allegations that Brown and Henderson had "verbally harassed" and "badgered her in a loud, unprofessional tone," did not create a triable question of fact as to whether she had been subjected to a hostile workplace.

Finally, on Ms. Atanus' retaliation claim, the court held that her transfer from the unassembled set of duties to the

position of procurement analyst did not constitute an adverse employment action. The court noted that both positions were classified as GS-11, that it was only a subdepartmental transfer and that, in any event, the reason for the transfer had been her request that the GSA move her to an official position so that a desk audit could be performed.[4]

## II

## DISCUSSION

### A.

This court reviews de novo a grant of summary judgment. *Hurst-Rosche Eng'rs, Inc. v. Commercial Union Credit Ins. Co.*, 51 F.3d 1336, 1341 (7th Cir. 1995). All facts and reasonable inferences must be construed in favor of the non-moving party. *Magin v. Monsanto Co.*, 420 F.3d 679,

---

[4] The district court concluded that Ms. Atanus had not advanced any failure to promote claim. Ms. Atanus' complaint did not include a failure to promote claim under either Title VII or the ADEA. In her memorandum in opposition to the GSA's motion for summary judgment, Ms. Atanus made passing reference to the fact that she had suffered the adverse employment action of failure to promote; however, she did not make any argument in support of this claim. The court ruled that, if she was making such a claim, it was barred because she had not amended her complaint to include it; that the other promotions had occurred long before her EEO complaint, and therefore the claim was time barred; and that she had failed to show that the individuals who were promoted instead of her were similarly situated. Ms. Atanus does not appeal this determination.

686 (7th Cir. 2005). We do not evaluate the weight of the evidence, judge the credibility of witnesses or determine the ultimate truth of the matter; rather, we determine whether there exists a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as matter of law." *Magin*, 420 F.3d at 686 (citing Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)); *see also Alexander v. Wisconsin Dep't of Health & Family Svrs.*, 263 F.3d 673, 681 (7th Cir. 2001) (noting that there is no heightened summary judgment standard in the employment discrimination context).

**B.**

Ms. Atanus claims that the GSA discriminated against her because of her race (Caucasian), color (white), religion (Christian-Catholic), gender (female), national origin (Assyrian) and age (born in 1958), in violation of Title VII and the ADEA.

In a Title VII or age discrimination case, a plaintiff may show discrimination under either the "direct" or "indirect" *methods* of proof, *Brown v. Illinois Dep't Natural Res.*, 499 F.3d 675, 681 (7th Cir. 2007), nomenclature which we have explained is "somewhat misleading," *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006); *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 902-03 (7th Cir. 2006). The nomenclature is misleading because the phrase "direct method" tends to imply that an

employee only may proceed under the direct method with "direct evidence." *See Sylvester*, 453 F.3d at 902-03. We recently have explained, however, that this is not the case. "'[D]irect' proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion (*e.g.*, 'You're too old to work here.'), but also *includes circumstantial evidence* which suggests discrimination through a longer chain of inferences." *Luks*, 467 F.3d at 1053 (emphasis supplied).

The focus of the direct method of proof thus is not whether the evidence offered is "direct" or "circumstantial" but rather whether the evidence "points directly" to a discriminatory reason for the employer's action. *Burks v. Wisconsin Dep't of Tranp.*, 464 F.3d 744, 751 n.3 (7th Cir. 2006) (noting that the "'direct method' . . . requires the plaintiff to put forth evidence that demonstrates that she was a member of a protected class and '*as a result* suffered the adverse employment action of which [s]he complains'" (quoting *Sylvester*, 453 F.3d at 902)). Thus, under the direct method of proof,

> [c]ircumstantial evidence demonstrating intentional discrimination includes: "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination."

*Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (quoting *Sun v. Bd. of Trs. of Univ. of Illinois*,

473 F.3d 799, 812 (7th Cir. 2007)). Although the district court, in considering Wauchop's conduct during the 1996 lunch, relied on earlier cases conflating the direct and indirect methods of proof with direct and indirect evidence, we are satisfied that the error is of no consequence to Ms. Atanus' case.[5] We therefore turn to her claims under the indirect method of proof.

---

[5]  Ms. Atanus' allegations about Wauchop's conduct during the 1996 lunch are insufficient to show discrimination under the direct methodology. Under the direct method of proof, as we have explained in the text, an employee may use circumstantial evidence that "suggests discrimination albeit through a longer chain of inferences." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). Nothing in the record suggests that Ms. Atanus' ten-day suspension occurred as a result of her nationality or that Ms. Atanus' nationality contributed to the decision. The lunch occurred over five years prior to any of the conduct at issue in this case, by which time Wauchop was no longer Ms. Atanus' supervisor. *Cf. id.* at 491 (explaining that a comment made more than a year before the employee's termination is too far removed to constitute evidence of discriminatory animus); *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 711 (7th Cir. 2000) (two years). Moreover, given Ms. Atanus' conduct toward Smith, who was her supervisor's boss, and given the GSA's uncontradicted evidence that Brown relied on Smith's report of that conduct in proposing the suspension, Wauchop's conduct does not support a reasonable inference that the GSA's motivation for suspending Ms. Atanus was bound up with her nationality or that her nationality contributed to the decision.

Nor can Wauchop's conduct during the 1996 lunch serve as circumstantial evidence of discrimination under the direct methodology with regard to the other acts about which Ms. Atanus complains because, as we shall explain, none of those acts constitute adverse employment actions.

The rubric of the indirect method was first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973). Under this methodology, Ms. Atanus may create a presumption of discrimination by establishing a prima facie case of discrimination. *Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1290 (7th Cir. 1997). This presumption shifts the burden to the GSA to produce a legitimate, noninvidious reason for its actions. *Id.* If the GSA satisfies its burden of production by rebutting her prima facie case of discrimination, the burden then shifts back to Ms. Atanus to show that the GSA's reasons "are false and only a pretext for discrimination." *Id.* To establish a prima facie case of discrimination under Title VII or the ADEA, Ms. Atanus must proffer evidence that: (1) she belongs to a protected class; (2) she performed her job according to the GSA's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably by the GSA. *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004). Summary judgment is appropriate if the employee fails to establish any of the foregoing elements of the prima facie case. *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007).

Ms. Atanus presents four contentions on appeal. She submits that the district court erred in determining that she had not established a prima facie case of discrimination on her Title VII and ADEA claims and that she had not presented any evidence that the GSA's non-discriminatory explanations were pretextual with regard to her ten-day suspension, the January 13, 2003 letter of instruction, the alleged verbal harassment from the February 13, 2003 meeting and the GSA's alleged retaliation for her EEO complaint. We shall examine each.

## 1. Ten-Day Suspension

There is no dispute that the ten-day suspension was an adverse employment action or that Ms. Atanus is a member of various protected classes. We thus shall discuss only the two remaining aspects of this suspension that are disputed.

### a.

Ms. Atanus, claiming that she was treated differently than other employees, submits that a material issue of fact exists regarding the alleged inappropriate conduct for which the GSA suspended her. According to Ms. Atanus, Smith "was unreceptive to [her] concerns and rebuffed her attempt to discuss" her suspension, and his treatment of her "illustrates the discrimination she faced by the Agency's management." Appellant's Br. at 13. She further asserts that the GSA's rationale for suspending her was pretextual because it was "false, self-serving and one-sided" and because she was not "loud, rude, or aggressive as Smith alleges." *Id.*

Ms. Atanus maintains that she was singled out for worse treatment than other similarly situated employees in the GSA. On this fourth prong of the *McDonnell Douglas* test, a plaintiff must show that members of the comparative group are "directly comparable to her in all material respects." *Burks*, 464 F.3d at 751 (internal quotation marks and citation omitted) (noting that relevant factors include "whether the employees reported to the same supervisor, whether they were subject to the same standards and whether they had comparable education, experience and qualification"). Keeping in mind that this prong ought not be applied in an "unduly rigid" or "narrow[]" manner,

Ms. Atanus has not put forth any evidence of employees outside of her various protected classes who acted in a materially similar manner but were treated more favorably. *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 845-46 (7th Cir. 2007) (noting that the plaintiff must show that "members of the comparison group are sufficiently comparable to her to suggest that she was singled out for worse treatment"). Indeed, Ms. Atanus has failed to point the court to *any* other GSA employee to serve as a basis for comparison. Rather, Ms. Atanus claims that the "record is devoid of others in [her] division receiving similar treatment from Smith" and the GSA. Appellant's Br. at 13. This contention, however, ignores that the burden of establishing a prima facie case is on her, *McDonnell Douglas*, 411 U.S. at 802, and, in any event, leaves us without any basis for comparing whether other employees in her division who were insubordinate, disorderly and rude to their supervisor's boss received similar treatment, *Henry v. James*, 507 F.3d 558, 566 (7th Cir. 2007) (holding that an employee had not established a prima facie case because "[h]is conduct was more egregious than that of the non-white officers he highlights").

### b.

Even if she had established a prima facie case of discrimination, Ms. Atanus has not shown that the GSA's reasons for her ten-day suspension are pretextual. A plaintiff may show pretext with "evidence that the employer's explanation is not credible." *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1039 (7th Cir. 1993). In this regard, an employee may show that the employer's reason had "no[] basis in fact," that the explanation was not the real reason for its action or that the reason stated

was insufficient to warrant the adverse job action. *Bahl*, 115 F.3d at 1291 (internal quotation marks and citation omitted). The main inquiry in determining pretext is whether the employer "honestly acted" on the stated reason rather than "whether the reason for the [adverse employment action] was a correct business judgment." *Id.* (noting that this court will not "take on the mantle of a super-personnel department reviewing the business decisions of [the] employer"); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006) ("An employer's mistaken belief that the plaintiff's conduct merited termination is not unlawful, so long as the belief was honestly held.").

The GSA's stated reason for suspending Ms. Atanus was her insubordinate, disorderly and rude conduct toward her supervisor's boss, her similar past conduct and her failure to explain herself. Ms. Atanus *admits* that she told Smith that "she did not believe Christians would act in this manner," that he would not suspend her "if he was a person of [G]od," that he was the one who should be suspended because he was doing his job improperly and that she would have his superior overturn his decision. R.37 ¶ 39, at 6 (responding to R.34 ¶ 39, at 6). Ms. Atanus does not contest that Brown's decision to suspend her was based upon Smith's report of Ms. Atanus' conduct. Ms. Atanus, in short, offers nothing more than her belief that her conduct toward Smith did not warrant a ten-day suspension to show that the GSA did not act honestly and in good faith.[6] *Cowan v.*

---

[6] We note that Ms. Atanus also does not proffer any evidence of pretext regarding the GSA's reason for suspending her for five days (which was the reason that Ms. Atanus was required

(continued...)

*Glenbrook Sec. Srvs., Inc.*, 123 F.3d 438, 444 (7th Cir. 1997) (perpetually tardy employee could not defeat a motion for summary judgment with mere speculative inference that termination was due to racial animus rather than record of tardiness). Indeed, she flatly asserts that a trial is warranted because this issue hinges on credibility and intent. Given the facts that Ms. Atanus has admitted, however, and given that she has no evidence of pretext, no reasonable jury could find that the GSA's stated reasons have no basis in fact, are not the real reasons for her suspension or that her conduct was insufficient to warrant the suspension. *Fane v. Locke Reynolds*, 480 F.3d 534, 541 (7th Cir. 2007) (affirming a grant of summary judgment where an employee was terminated for "rude behavior, insubordination, and not recognizing her own inappropriate behavior" and where the employer believed that such conduct warranted termination and honestly acted pursuant to that belief); *Gadsby v. Norwalk Furniture Corp.*, 71 F.3d 1324, 1337-38 (7th Cir. 1995) (Flaum, J., concurring).

## 2. Letter of Instruction

Next, Ms. Atanus submits that she presented a prima facie case of discrimination regarding the letter of instruction that she received on January 13, 2003. The letter stated that she had not been following GSA guidelines for the modification and extension of contracts. According to Ms. Atanus, a comparison of the letter that

---

[6] (...continued)
to meet with Smith) for her improper handling of a FOIA request.

she received with letters received by employees outside of her protected classes reveals that the letters received by other employees were boilerplate, much less severe in tone and did not threaten termination.

Ms. Atanus has not shown that the January 13, 2003 letter of instruction was an adverse employment action. In *Sweeney v. West*, 149 F.3d 550, 556-57 (7th Cir. 1998), we declined to consider "two counseling statements," which admonished the employee to improve, as adverse employment actions or as having tangible job consequences because the employee had not pointed to any immediate consequences of the reprimands, such as an eligibility for promotion, transfer to a favorable location, an advantageous increase in responsibilities or similar benefits. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901, 902 (7th Cir. 2003) (noting that, although the "definition of an adverse employment action is generous," an employee "must show some quantitative or qualitative change in the terms or conditions of his employment" or some sort of "real harm"); *Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001); *cf. Coolidge v. Consol. City of Indianapolis*, 505 F.3d 731, 735 (7th Cir. 2007) (explaining that two reprimands followed by termination constitute an adverse employment action). The same is true here. The letter itself does not state that Ms. Atanus is being disciplined for her second failure to follow FAR 4.2; rather, it warns that disciplinary action may be taken if she fails to comply with the directive of the letter. Ms. Atanus was not terminated or demoted, and she does not allege that her job responsibilities were changed because of the letter. Indeed, after Ms. Atanus requested that the GSA conduct a desk audit, the agency developed an official position, specifically

for her and at the same GS-11 grade, to comply with her request.[7]

Ms. Atanus, moreover, has not established that the employees who received letters of instruction were similarly situated. The letter that Ms. Atanus received was not written by the manager who issued letters to the other employees. Additionally, this letter was Ms. Atanus' second letter of instruction for failing to follow the same GSA regulation. The letter references the prior letter of instruction that Ms. Atanus had received, in which Ms. Atanus had been warned that further violations of FAR 4.2 "could lead to disciplinary action, up to and including removal." R.37, Ex. 5 at 2. Because employers are justified in reprimanding employees more severely for repeated errors and because Ms. Atanus has not submitted any evidence indicating that the two other employees who received less severe letters had been reprimanded in the past, she has failed to show that these employees were similarly situated. Accordingly, Ms. Atanus has not established a prima facie case of discrimination with regard to the January 13, 2003 letter of instruction.

---

[7] Ms. Atanus, as she did before the district court, intersperses throughout her brief allegations that she was refused promotion while other GS-11 contract administrators were promoted to GS-12. Ms. Atanus, however, does not contend, nor could she on this record, that the GSA's failure to promote her was related to this letter of instruction. *Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 613-14 (7th Cir. 2001); *cf. Spiegla v. Hull*, 371 F.3d 928, 941-42 (7th Cir. 2004).

### 3. Verbal Harassment

Ms. Atanus contends that her Title VII rights were violated when Brown and Henderson verbally harassed her during the February 13, 2003 meeting. Ms. Atanus claims that Brown "badgered her in a loud, unprofessional tone" and that she perceived Brown's comments as "discriminatory and harassing." Appellant's Br. at 19.

An employee may bring a Title VII discrimination claim alleging that the employer is responsible for a hostile work environment. The employee must demonstrate that: (1) "he was subject to unwelcome harassment"; (2) the harassment was based on a protected characteristic; (3) "the harassment was severe and pervasive so as to alter the conditions of the employee's environment and create a hostile or abusive working environment"; and (4) "there is a basis for employer liability." *Mason v. So. Illinois Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000). Whether an employer's conduct creates a hostile work environment is not subject to "a mathematically precise test" and "can be determined only by looking at all the circumstances." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22-23 (1993). Relevant circumstances include "the frequency and severity of the conduct; whether it was threatening and/or humiliating or merely an offensive utterance; and whether the harassment unreasonably interfered with her work." *McPherson v. City of Waukegan*, 379 F.3d 430, 438 (7th Cir. 2004).

Ms. Atanus has not provided any specifics as to the content of Henderson's and Brown's statements during the meeting or whether their remarks referenced her race, color, national origin, gender, religion or age. She also does not establish that their conduct affected her work performance. Under our case law, being addressed

in a loud, unprofessional tone during one meeting does not satisfy the requirement that the offensive conduct be severe and pervasive. *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005); *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533, 537 (7th Cir. 1993) (noting that "relatively isolated instances of non-severe misconduct will not support a hostile environment claim" and holding that a supervisor's conduct, though "inappropriate and unprofessional," was not "so serious or pervasive that it created a hostile work environment within the meaning of Title VII"); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (remarking that Title VII is not a code of "general civility").[8]

---

[8] We cannot accept Ms. Atanus' claim that the district court erred by not considering the harassment in conjunction with the other acts that form the basis for her case. *See, e.g.*, *Silk v. City of Chicago*, 194 F.3d 788, 807 (7th Cir. 1999) (acknowledging "that, in discrimination cases, the 'whole can be greater than the sum of the parts,' and that it is quite appropriate for a plaintiff to 'ask the trier of fact to draw an inference of discrimination from a pattern of behavior when each individual act might have an innocent explanation.'" (quoting *Vande Zande v. State of Wisconsin Dep't of Admin.*, 44 F.3d 538, 546 (7th Cir. 1995))). It is unclear whether Ms. Atanus is claiming that the alleged verbal harassment incident helps her establish her prima facie discrimination claim or whether the other incidents of alleged discrimination assist her in establishing the hostile work environment claim; either way, her contention is unpersuasive.

As we have discussed above, Ms. Atanus has admitted facts showing that she was insubordinate, disorderly and rude to her superior, and she has failed to put forth any evidence showing that she correctly performed the tasks for which the GSA issued her the letters of instruction. The GSA has provided

(continued...)

**4. Retaliation**

Lastly, we turn to Ms. Atanus' contention that the GSA retaliated against her when it transferred her to a different position within the same GS-11 level after she filed a formal complaint of discrimination with the EEOC. Title VII proscribes an employer from retaliating against an employee who has engaged in statutorily protected activity. *See* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this

---

8 (...continued)

solid, non-discriminatory reasons for suspending her and for issuing the letters of instruction. Ms. Atanus has not proffered any evidence showing those reasons to be pretextual, and, therefore, she cannot say that the alleged verbal harassment strengthened her other claims.

Nor does Smith's conduct toward Ms. Atanus during her repeated attempts to discuss her suspension or his threats to call a federal protective services officer if she did not calm down and return to her work station rise to the level of a hostile work environment, even when considered "collectively and cumulatively" with her meeting with Henderson and Brown. *Id.* at 804, 807 (explaining that a plaintiff, to defeat summary judgment in a hostile work environment claim, must "demonstrate that a rational trier of fact could find that his workplace is permeated with discriminatory conduct—intimidation, ridicule, insult—that is sufficiently severe or pervasive to alter the conditions of his employment").

subchapter."). Ms. Atanus proceeds under the indirect
method of proof.

Under the indirect methodology, an employee must
present sufficient evidence to establish a prima facie
case of retaliation. The employee must show that
"(1) she engaged in statutorily protected activity;
(2) she performed her job according to her employer's
legitimate expectations; (3) despite meeting her em-
ployer's legitimate expectations, she suffered a mate-
rially adverse employment action; and (4) she was
treated less favorably than similarly situated employees
who did not engage in statutorily protected activity." *Hilt-
Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002);
*see also Hudson v. Chicago Transit Auth.*, 375 F.3d 552,
560 (7th Cir. 2004). "Under the indirect method of proof,
failure to satisfy any one element of the prima facie case
is fatal to an employee's retaliation claim." *Hudson*, 375
F.3d at 560. Once the employee establishes a prima
facie case, the burden shifts to the employer to offer a
legitimate, non-discriminatory reason for the adverse
employment action. *Hilt-Dyson*, 282 F.3d at 465. The burden
then shifts back to the employee to demonstrate that the
employer's reason is pretextual. *Id.* (noting that, at this
point, summary judgment is proper if the employee fails
to establish pretext).

We focus on whether Ms. Atanus has suffered a materi-
ally adverse employment action—the third prong of
her prima facie case. Adverse employment action "has
been defined quite broadly in this circuit." *Smart v. Ball
State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996); *Oest*, 240 F.3d at
612. We have recognized that "creating a precise list
of activities that constitute adverse employment ac-
tions would be impossible because of the unique circum-

stances of individual cases," but we have noted some examples of adverse employment actions: "'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [and] significantly diminished material responsibilities.'" *Hilt-Dyson*, 282 F.3d at 465-66 (quoting *Ribando v. United Airlines, Inc.*, 200 F.3d 507, 510 (7th Cir. 1999)). Given this flexible, *practical* approach, "we have emphasized that an adverse employment action need not be quantifiable in terms of pay or benefits." *Id.* at 466. An adverse employment action, nevertheless, "is one that is materially adverse, 'meaning more than a mere inconvenience or an alteration of job responsibilities.'" *Id.* at 465 (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). Accordingly, "not everything that makes an employee unhappy is an actionable adverse action." *Smart*, 89 F.3d at 441. For example, we have held that a transfer and job title change from assistant vice-president and manager of one bank branch to a loan officer position at a different branch is not necessarily, by itself, a materially adverse employment action. *Crady*, 993 F.2d at 136; *see also Grayson v. City of Chicago*, 317 F.3d 745, 749-50 (7th Cir. 2003) (holding that a difference in job title alone—where the positions are identical in terms of work, pay and benefits—is not materially adverse); *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 457 (7th Cir. 1994).

Construing the record broadly,[9] Ms. Atanus asserts that

---

[9] Ms. Atanus has taken inconsistent positions with regard to this claim. In the materials submitted in opposition to the GSA's summary judgment motion, she admitted that the GSA trans-

(continued...)

the GSA retaliated against her by transferring her from a contract specialist (GS-11) position to the position of procurement analyst (GS-11) after she filed her complaint with the EEOC. Ms. Atanus has not explained whether the change in title entailed any change in the work that she was performing, whether there was a change in geographic location or whether the position restricted her opportunities to advance within the GSA. Without more factual development, Ms. Atanus' claim that she suffered an adverse employment action is deficient.

## Conclusion

For the reasons set forth in this opinion, the judgment of the district court is affirmed.

AFFIRMED

---

[9] (...continued)
ferred her to the position of procurement analyst in an effort to comply with her request, which was made before she filed her complaint with the EEOC, that the GSA perform a desk audit on the work that she was performing. *See* R.37 ¶¶ 70-74, at 8 (responding to R.34 ¶¶ 70-74, at 10). In the same statement of facts, however, she asserted that the GSA transferred her to the position of contract specialist first and then, after her EEO complaint, transferred her to the position of procurement analyst. R.37 ¶¶ 34-36, at 13. Because the timing of the events makes no difference to our decision, it is unnecessary for us to determine whether Ms. Atanus is bound by her prior stipulation to the GSA's version of the facts.

---