In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-1610

ROBERT W. SENSKE,

*Plaintiff-Appellant,*

*v.*

SYBASE, INCORPORATED,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 2451—**Charles R. Norgle, Sr.,** *Judge.*

ARGUED SEPTEMBER 24, 2009—DECIDED DECEMBER 3, 2009

Before BAUER, KANNE, and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge.* In 2005 Robert Senske was fired from his position as a high-ranking sales manager with Sybase, Incorporated, a software and systems-management company with an office in Chicago. Sybase says it fired Senske because a client complained about his performance and because he was dilatory in completing required paperwork, was persistently tardy for meetings, and was not a team player. Senske says he was fired

because his manager considered him too old. Senske sued Sybase under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 *et seq.*, alleging that Sybase concocted fictional reasons to fire him in an attempt to disguise age discrimination. The district court concluded that no reasonable jury could find that discrimination, rather than Senske's performance deficiencies, was the root cause for Senske's termination and granted summary judgment to Sybase. Senske appeals.

We view the following undisputed facts in the light most favorable to Senske.[1] *See Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640 (7th Cir. 2008). In the summer of 2002, when Senske was 55 years old, Sybase hired him to fill the role of Strategic Account Manager, or "SAM 2." As a SAM 2, Senske was required to establish new, and enhance existing, client relationships. He was also charged with meeting certain assigned revenue quotas. Senske's employment did not get off to a stellar start. In his first annual performance review his then-supervisor, Terry Stempel, rated his overall performance for 2003 as "marginal."

---

[1] We note that in his reply to Sybase's Local Rule 56.1 statement of facts, Senske repeatedly and improperly characterizes facts as disputed without citing evidence that directly contradicts Sybase's assertions. These responses are insufficient to demonstrate a genuine fact dispute, and where Senske has responded improperly, we deem admitted the cited fact. *See Flaherty v. Gas Research Inst.*, 31 F.3d 451, 453 (7th Cir. 1994). We also note that Sybase omitted from its appendix cited portions of deposition transcripts. We have ignored any references to testimony not in the record.

Stempel characterized Senske's sales performance as "unacceptable," his pipeline of potential revenue as "insufficient," and his follow-through on paperwork as lacking in "discipline." Although his review noted that "the employee needs to be placed immediately on a Performance Improvement Plan," Stempel opted not to discipline Senske.

In October 2004 Allan Roeder replaced Stempel as Senske's supervisor. Their first meeting didn't go well. Depending on whose story is believed, Senske was late by at least 30 minutes, and perhaps by up to 90 minutes, in picking Roeder up at the airport. Senske's tardiness on that day was not an isolated event. According to Roeder's supervisor, Barb Stinnett, Senske persistently was late to or absent from weekly conference calls with the management team.

Although in 2003 Senske met only 54 percent of his annual revenue goal, in the fourth quarter of 2004 he participated in two deals that led him to achieve 186 percent of his $2.5 million sales quota. The first involved HSBC, which had acquired Household Finance, one of the accounts Senske inherited when he joined Sybase in 2002. Senske was authorized to offer HSBC up to a 5 percent discount off of the list price for Sybase's products. When HSBC asked for more, Senske followed company policy and brought Roeder and Presales Manager Mehul Rajparia onto the deal. Problems arose during the closing process, but despite Roeder's request that he participate in the contract negotiations, Senske left it up to Roeder and Rajparia to hammer out the details. When

the $940,000 deal closed in December 2004, Senske received 90 percent of the commission credit.

By far the larger of the two deals involved JPMorgan Chase, which in 2004 merged with one of Senske's clients, Bank One. Prior to the merger, Senske had proposed a $912,500 deal to Bank One. When the JPMorgan acquisition was announced in the early summer of 2004, Senske's deal with Bank One was put on hold. Following the merger, Senske got a call from Eric Johnson, the head of FSI, which is Sybase's New York-based financial services group. Johnson told Senske that FSI would handle the deal going forward but would split the resulting commission with him 50-50. FSI took a new strategy on the deal and did not ask Senske to participate in the deal's negotiation or closing. Senske continued to be involved to the extent that he communicated with his Bank One contacts and discussed with colleagues how Sybase could generate new revenue from the merger. The deal structured by FSI closed in December 2004 at $5.2 million, more than five times the size of the deal Senske originally pitched to Bank One. Nonetheless, pursuant to his agreement with Johnson, Senske was credited with $2.6 million in revenue from the deal. Without that credit, Senske would not have met his 2004 revenue quota; with it, he exceeded his quota by 86 percent and became Sybase's top North American earner for the year. Because he exceeded his 2004 sales quota, Senske was invited to join the President's Club, a reward program for high-achieving Sybase employees.

In January 2005 Roeder completed Senske's performance review for 2004. Roeder gave Senske the highest possible

rating for revenue accomplishment but noted that he would not have met his quota without the JPMorgan deal. Roeder gave Senske lower scores in the categories of paperwork completion and pipeline readiness. Roeder noted that Senske "is consistently late in updating or accurately completing weekly reports," and commented that his pipeline "does not meet current or future corporate guidelines for pipeline performance." Despite these criticisms, Roeder scored Senske's overall performance in the "good" category, meaning he was "meeting all, and possibly exceeding some, performance requirements."

That same month Sybase introduced the managers to a new planning tool called "blue sheets," but Stinnett and Roeder perceived Senske as resisting the new method. In the ensuing months Senske maintained his resistance, never turning in a blue sheet (or, at most, submitting one). He also continued to be late to or absent from weekly calls.

In late 2004 and the first several months of 2005, Roeder counseled Senske about problems that arose on two of Senske's accounts: Citadel and HSBC. Roeder perceived Senske as having difficulty communicating with or meeting the needs of the decisionmaker at Citadel, Matt Swan. Roeder thought that Citadel's technical problems remained unresolved for too long, but despite Roeder's prompting, Senske had not come up with an action list to address that concern. As for the HSBC account, Roeder fielded complaints from Eric Johnson, who said that Senske was not sharing his HSBC contacts or leveraging his networks with FSI, which was

handling the post-merger JPMorgan account. Roeder discussed these complaints with Senske and told him it was "mandatory" that he be "a participant in a team."

In March 2005 Roeder prepared a Performance Improvement Plan (PIP) for Senske which Stinnett and Stinnett's boss, Steve Capelli, approved. The PIP informed Senske that he needed to improve his account and closing strategy and demonstrate his ability to "close competitive opportunities." Roeder noted that Senske had relied on him to close deals with HSBC and Citadel instead of taking ownership of the deals himself. He also relayed some of Swann's complaints, noting that Senske did not understand Swann's negotiating preferences and other management needs. Roeder further noted that Senske was unresponsive to his requests for timely and complete account updates and reports. Roeder informed Senske that he must improve his closing skills, respond to management requests in a timely manner, provide weekly blue sheets, and tighten up his "account plans and strategy to the point where your accuracy approaches 100%." The PIP emphasized that Senske would be fired unless he made the required improvements within 60 days.

Three key events unfolded during Senske's 60-day PIP period. First, in late May Senske arrived 45 minutes late for a meeting with Citadel and then failed to take notes during the meeting. Roeder chastised him by e-mail, saying, "It's a lack of professionalism to always be late. It sends the wrong signal." Next, in early June Swann met with Roeder and expressed his frustration with what he

considered Senske's poor commitment to the Citadel account. Swann later e-mailed Roeder saying, "I have very limited confidence that Bob Senske and [another employee] are capable of providing the level of support required by Citadel." He noted Citadel's need for Sybase to "deliver consistent follow up from an account management perspective," and emphasized his desire for "quality, proactive support management." Roeder forwarded the e-mail to Stinnett, saying, "Citadel is defcon 4. I believe this is our last chance [t]o salvage this." Finally, the day after Swann e-mailed Roeder, Johnson e-mailed Stinnett to complain that Senske had "run loose" on the HSBC account and was refusing to work with other members of the team. Johnson told Stinnett, "This cannot continue. Besides being counterproductive, it is just wrong."

Five days later Roeder wrote a memo to human resources recommending Senske's termination. He referenced the complaints from Swann and Johnson, and said that Senske's "lack of strategic planning forces his management team to get his deals across the finish line." He further noted Senske's ongoing tardiness to meetings, stating that he "has been late for every meeting I have participated in with him." Roeder also emphasized Senske's persistent failure to complete blue sheets and his lack of initiative. Stinnett and Capelli both agreed with Roeder's recommendation.

After receiving Roeder's memo, a human resources executive, Nita White-Ivy, e-mailed Capelli saying that it was "weird" that a member of the President's Club would

be recommended for termination. Capelli responded saying that Senske "made his numbers based upon two rather large splits with another sales rep." Stinnett forwarded an analysis to White-Ivy showing that Senske had made his revenue quota in only one of the previous eight quarters, and Capelli emphasized that the termination recommendation was based on Senske's poor account management. White-Ivy approved the termination. Senske was 58 years old on the day he was fired.

Senske sued Sybase under the ADEA alleging that he was fired because of his age. In response to Sybase's summary judgment motion, Senske argued that he met the second and fourth prongs of the prima facie case under the burden-shifting test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), by demonstrating that he was meeting Sybase's legitimate expectations and that Sybase treated him less favorably than younger, similarly situated employees. He also argued that Sybase's explanations for his termination were pretext to cover up its discriminatory motive. The district court concluded that the evidence "overwhelmingly supports Sybase's decision to terminate the plaintiff irrespective of his age," and thus granted summary judgment for Sybase. On appeal Senske renews his argument that Sybase's explanations for firing him were pretextual.

We review de novo the district court's grant of summary judgment to Sybase. *See Faas*, 532 F.3d at 640. To prevail under the ADEA Senske must show by a preponderance

of the evidence that his age was the but-for cause of Sybase's decision to fire him. *See Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2352 (2009). Because Senske chose to proceed under the indirect method of proving discrimination, typically we would run through the four factors for establishing a prima facie case under the familiar *McDonnell-Douglas* test before turning to the question of pretext. *See, e.g., Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 453-54 (7th Cir. 2009). But here, Senske argues that Sybase is lying about its legitimate employment expectations in order to set up a false rationale for terminating him. Accordingly, the question of whether he was meeting Sybase's legitimate expectations merges with the question of whether Sybase's reasons for firing Senske are pretextual. *See McGowan v. Deere & Co.*, 581 F.3d 575 (7th Cir. 2009); *Faas*, 532 F.3d at 642. We therefore focus on the question of pretext, bearing in mind that without sufficient evidence of pretext Senske cannot show that he was meeting Sybase's legitimate expectations. *See Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006).

Senske may demonstrate pretext directly by showing that "a discriminatory reason more likely motivated" his termination, or indirectly by showing that Sybase's explanations are "unworthy of credence." *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). To show that Sybase's explanations are not credible, Senske must point to evidence that they are not the real reasons it fired him, have no grounding in fact, or are insufficient to warrant the termination decision. *See Atanus v. Perry*, 520 F.3d 662, 674 (7th Cir. 2008). Senske must show that

Sybase is lying with respect to each of its proffered explanations, unless this is the rare case where one reason is so "fishy and suspicious" as to cast doubt on them all. *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 403-04 (7th Cir. 2008). At the end of the day, the question is simply whether "the same events would have transpired" if Senske "had been younger than 40 and everything else had been the same." *See Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir. 1994) (citations omitted).

The central premise of Senske's pretext argument is that no juror could believe that Sybase's top earner for North America in 2004 would be fired for performance deficiencies in 2005. *See, e.g., Brown v. M&M/Mars*, 883 F.2d 505, 510 (7th Cir. 1989) (noting that pretext may be inferred where employee fired despite consistent positive performance). Senske points to the undisputed fact that he exceeded his revenue quota for 2004 and argues that his success in that area overshadows the shortcomings Sybase cites to justify his termination. Senske notes that revenue generation is the most heavily weighted performance criteria in the written review for a SAM 2 and points out that Roeder gave Senske the highest possible score for that criteria in his review for 2004. Senske also relies heavily on the fact that he was invited to join the President's Club just days before Roeder recommended firing him. In essence, Senske argues that given his outstanding revenue numbers for 2004, the reasons Sybase articulates—his failures to act as a team player, complete required paperwork, or correct his persistent tardiness, along with the client complaint—are simply insufficient to warrant his termina-

tion, and accordingly a jury could find them pretextual. *See, e.g., Atanus*, 520 F.3d at 674.

Despite his efforts to cast himself as a revenue-generating wunderkind, Senske has not rebutted the voluminous evidence showing that his 2004 revenue performance was anomalous. It is undisputed that Senske made only 54 percent of his revenue quota for 2003 and that Roeder's predecessor considered his sales performance "unacceptable." In fact, Senske did not meet his revenue quota in any of the eight quarters preceding the fourth quarter of 2004. And up until that quarter, Senske was making only 29 percent of his annual quota for 2004.

What's more, Senske's success in the fourth quarter of 2004 hinged entirely on the deals with JPMorgan and HSBC, and Senske has not rebutted the evidence demonstrating that Roeder and his superiors believed that the credit he received for those deals overstated his actual contribution. As for HSBC, Sybase showed that Senske worked on the deal for almost two years without producing any revenue, and when the $940,000 deal finally closed late in 2004, he abdicated to Roeder the task of negotiating the final details. But even if Senske fully earned the HSBC credit, he needed the 50 percent credit on the JPMorgan deal to exceed his 2004 quota.

Sybase has convincingly shown that Senske's credit for the JPMorgan deal stems from what is known in the sales industry as a "bluebird," a deal that flies in the metaphorical window with little or no work on the part of the salesperson. Senske does not dispute that the deal he pitched to Bank One was less than one-fifth the size of the deal that eventually closed, nor does he dispute that

the New York office took the lead—indeed, took an entirely new strategy—in negotiating and closing the post-merger deal with JPMorgan. He also acknowledges that the decision to credit him 50 percent of the commission was made before the merger and before any of the work on the new deal began. The only evidence Senske cites to support his assertion that he contributed significantly to the JPMorgan deal is his own testimony saying that he continued to work with his Bank One contacts to make sure they received the products they discussed pre-merger and that he met with Sybase employees to talk about how to generate revenue post-merger. If anything, this evidence proves Sybase's point—that his involvement post-merger was tangential at best.

Senske also makes much of the fact that his 2004 revenue numbers garnered him an invitation to the President's Club. The evidence shows that Sybase extends membership in the President's Club to sales managers who meet their annual quota. The parties dispute whether there are discretionary factors above and beyond the hard numbers, but the dispute is immaterial, because Senske has pointed to no evidence to show that *his* invitation was based on anything other than his bluebird-driven 2004 revenue achievement. Senske points to White-Ivy's e-mail saying that it was "weird" that Roeder was recommending the termination of a member of the President's Club and argues that her statement shows that his membership should have insulated him. But White-Ivy approved the termination after Capelli explained that his revenue numbers stemmed from a blue-bird and Stinnett showed that in other revenue quarters Senske consistently underperformed. These responses

show that supervisors other than Roeder—who is the only decisionmaker Senske accuses of discriminatory animus—agreed that Senske's 2004 revenue numbers did not accurately reflect his contributions. Accordingly, a reasonable jury would not conclude that Senske's revenue performance so outweighed the cited performance deficiencies as to raise an inference of pretext.

Not only has Senske failed to demonstrate that Sybase's explanations are insufficient to justify his dismissal in light of his revenue performance, but he has pointed to no evidence casting doubt on their sincerity. *See Atanus*, 520 F.3d at 674. Perhaps the most solid explanation is the complaint from Swann about Senske's management of the Citadel account. As we have noted, mere days before the termination decision, Roeder received what he characterized as a "defcon 4" e-mail from Swann. In that e-mail Swann twice named Senske and another employee as the source of his dissatisfaction with Sybase and emphasized that Sybase's account management was not meeting his minimum expectations.

No reasonable juror could find that Roeder was overstating the seriousness of the e-mail; Swann made it clear that Citadel would not engage in any more transactions with Sybase until his complaints were resolved. Senske tries to deflate the e-mail's impact by arguing that Swann was dissatisfied with technical issues for which the other employee named in the e-mail was entirely responsible. That characterization is belied by the text of the e-mail, which repeatedly cites lackadaisical account management as the source of Swann's frustration. Senske was the manager of the account. And in any event, the evidence

demonstrates that Senske's troubles with Swann predated the e-mail. Even before the PIP, Roeder had counseled Senske about his failure to follow up with Swann or interpret his needs correctly. And in the PIP itself, Roeder cites Senske's failure to interpret Swann's needs as an example of his deficient management skills. Given these facts, no reasonable jury would believe Senske's theory that Roeder wrongly pinned the blame for Swann's discontent on him as a trumped-up excuse to fire him for age-related reasons.

Nor has Senske cast doubt on the sincerity of Sybase's determination that Senske failed to act as a team player on the HSBC account. In his termination recommendation, Roeder explained that Eric Johnson, the New York executive who helped coordinate the JPMorgan deal, complained repeatedly that Senske failed to return phone calls and was not perceived as a team player. Senske argues that this complaint is insincere because, he says, he followed company policy on the HSBC account by dealing directly with a global account manager rather than the New York office. But even if that were the correct protocol, it does not change the fact that Roeder had to field complaints from the New York office that Senske was cutting off the team in a way that was counterproductive. And in any event, the question is not whether Roeder correctly assessed his ability to work with the team, but rather whether he did so honestly. *See Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 575 (7th Cir. 2003). Given that the record shows that the team-player complaint originated with Johnson and not Roeder, no reasonable jury would conclude that Roeder fabricated this justification as pretext to hide discriminatory animus.

Because the customer and internal complaints are sufficient, standing alone, to show that Senske's age was not the but-for cause of his termination, *see Gross*, 129 S. Ct. at 2352, we review Sybase's remaining explanations only to ensure that nothing about them is so fishy as to create doubt where so far none has been shown, *see Fischer*, 519 F.3d at 403-04. First, there is the matter of Senske's recurring tardiness. Both Stinnett and Roeder expressed frustration with Senske's persistent tardiness to team phone calls, and the evidence shows that the problem spilled over into arguably more important engagements, such as picking his boss up at the airport and attending client meetings.

Senske does not seriously attempt to dispute the facts showing that he was commonly late but instead argues that a jury could infer pretext from what he characterizes as Sybase's "shifting position" on whether tardiness was a factor in its termination decision. *See Schuster*, 327 F.3d at 577. As evidence of the supposed shift, Senske points to Sybase's response to a questionnaire it completed in connection with the agency-review precursor to this suit. The questionnaire asked Sybase to respond to a number of questions if "attendance was a factor" in Senske's termination. Sybase responded that the question is "not applicable." Senske points out that one of the follow-up questions Sybase would have answered if attendance were a factor was, "what constitutes an occurrence of . . . tardiness." Under Senske's tortured reading of the question, Sybase's "not applicable" response shows that tardiness was not among the original explanations for his termination. But Sybase has never asserted that attendance (as opposed to tardiness) was a factor in his

termination, and under a straightforward reading it was not required to answer the follow-up question about tardiness unless it agreed that attendance *was* a factor. Especially when held against the unrebutted evidence that Senske's bosses were frustrated by his tardiness for months, there is no obvious inconsistency that permits an inference of pretext. *See id.* at 577-78. And by no means is the supposed shift so fishy as to render suspect the other nondiscriminatory explanations. *See Fischer*, 519 F.3d at 403-04.

Next, Senske argues that there is a material fact dispute over whether Roeder's dissatisfaction with Senske's paperwork motivated his termination recommendation. Again, Senske makes only a half-hearted attempt to show that he met the paperwork requirements (he didn't), but instead argues that a jury could infer pretext because, according to him, Roeder held three younger employees—Michael Clark, Heather Jones, and Jonathan Dorsey—to lower standards even though none of them were meeting their annual revenue quotas. But Senske has not shown that any of these younger colleagues were similarly situated to him. Although the "similarly situated" concept is a flexible one, *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007), the comparators must be similar enough that differences in their treatment cannot be explained by other variables, such as distinctions in their roles or performance histories, *Filar v. Bd. of Educ. of Chi.*, 526 F.3d 1054, 1061 (7th Cir. 2008). Here, the evidence shows that Senske's three colleagues were SAM 2s at the time of this litigation, but Senske has not shown that Clark or Jones held that position during Senske's employment. The evidence shows that at the time of

Senske's employment Clark and Jones had less experience than Senske and held lower-ranking sales positions. Sybase was entitled to hold lower-ranking employees to lower standards than those it applied to Senske. *See Hoffman v. MCA, Inc.*, 144 F.3d 1117, 1124 (7th Cir. 1998). There is conflicting evidence over whether Dorsey was a SAM 2 in 2004, but even if he was, and the same standards applied to him and Senske, Senske has not shown that Dorsey—nor any of the supposedly similar employees, for that matter—never turned in required blue sheets. Nor has he shown that they were consistently tardy or the subject of client and internal complaints. In short, Senske simply has not shown that any of his comparators were similar enough to him to render suspicious any supposed distinctions in their treatment.[2] *See Filar*, 526 F.3d at 1061.

Finally, Senske argues that he has submitted direct evidence from which a jury could conclude that age, rather

---

[2] Senske tries to apply the "shifting explanations" tack to Sybase's position with respect to whether his three colleagues are in fact similarly situated, but the attempt merits little attention. Senske asserts that Sybase admitted in its response to an interrogatory that the three colleagues he identifies are similarly situated and then in briefing shifted its position. The interrogatory asked Sybase to identify people with Senske's job title, and Sybase listed the three colleagues. But Sybase has never disputed that by 2006—when it answered the interrogatory—the three colleagues had become SAM 2s. That does not mean it admitted similarity in the first half of 2005, and so, once again, the supposed shift Senske identifies is not a true inconsistency.

than the cited professional shortcomings, most likely motivated Sybase's decision to fire him. *See Burdine*, 450 U.S. at 256. His direct evidence of pretext consists of the undisputed facts that within his first nine months at Sybase Roeder fired the two oldest managers under his supervision: Senske and Jeffrey Stutz. Senske calls this timing suspicious, but it is suspicious only if Senske shows that Sybase's reasons for firing them are false. The evidence shows that Roeder fired Stutz because of his poor sales performance. Senske summarily asserts that Roeder lied about Stutz's "quota and performance," but the argument is underdeveloped and unsupported by the evidence to which he points. Even if the evidence supported his assertion that Roeder lied with respect to Stutz's termination, that evidence would not overcome the virtual avalanche of documentation showing that Senske's performance consistently fell short of Sybase's expectations. Accordingly, we agree with the district court's conclusion that no reasonable jury could find that his age was the real reason behind Senske's termination.

The judgment of the district court is AFFIRMED.