In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2002

MARK SKIBA

*Plaintiff-Appellant,*

*v.*

ILLINOIS CENTRAL RAILROAD COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-5353 — **Ronald A. Guzmán**, *Judge.*

ARGUED FEBRUARY 23, 2018 — DECIDED MARCH 8, 2018

Before FLAUM, SYKES, and HAMILTON, *Circuit Judges.*

FLAUM, *Circuit Judge*. Plaintiff-appellant Mark Skiba alleges his former employer, defendant-appellee Illinois Central Railroad ("IC"), unlawfully discriminated against him on the basis of age and national origin, as well as retaliated against him for complaining about a superior, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–34, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17. The district court

granted summary judgment in favor of IC. Plaintiff now appeals. For the reasons stated below, we affirm.

## I. Background

### A. Factual Background

IC is a subsidiary of the Canadian National Railway Company ("CN"), a Canadian corporation that operates rail and transportation businesses in the United States and Canada. In June 2008, IC hired plaintiff, a United States citizen, as an entry-level management trainee in its Railroader Trainee Program. At the time, plaintiff was fifty-five years of age. Plaintiff completed the Railroader Trainee Program in 2009 and subsequently served in multiple management-level positions, including Mechanical Officer—Special Projects and Car Mechanical Supervisor.

In February 2011, at the age of fifty-eight, plaintiff applied for a promotion to Motive Power Supervisor in IC's Motive Power Department in Homewood, Illinois. Plaintiff alleges that during his interview, Jim Voytechek, IC's Director of Systems Network Operations, asked him his age. Voytechek denies this claim. He acknowledges, however, that plaintiff had "a good interview," "spoke very confidently," and appeared "orderly and focused." As a result, plaintiff was awarded the promotion. In his new role, plaintiff reported to Daniel Clermont, the Senior Manager of the Motive Power Department, who in turn reported to Voytechek. Clermont and Voytechek are both Canadian citizens.

In June 2012, one of plaintiff's co-workers filed a complaint with IC's Human Resources Department regarding Clermont's workplace conduct. Specifically, the employee alleged Clermont was "verbally abusive," "used profanity,"

and "insulted employees." Veronica Loewy, an IC Human Resources Associate, was assigned to investigate the complaint.

In an email to Loewy sent on July 4, 2012, plaintiff confirmed Clermont's "abusive conduct" and stated Clermont frequently "berat[ed], badger[ed], and disrespect[ed]" his subordinates. Plaintiff further alleged Clermont's "continual personal abuse and belittling" created a "stressful" work environment that caused him to "have nightmares." Notably, however, plaintiff did not claim that any protected class status under the ADEA or Title VII (i.e., race, color, religion, sex, national origin, or age) served as the impetus for Clermont's conduct.[1]

Plaintiff sent another email to Loewy on September 16, 2012. In it, plaintiff recounted that Clermont was "abusive/argumentative" towards him on September 9, 2012. Plaintiff alleged that as a result of Clermont's behavior, he experienced "shortness of breath" and "a dull chest pain" and was taken to the hospital. He further stated that the high stress induced by Clermont's management style caused a "ventricular arrhythmic condition" and high blood pressure. Once again, plaintiff did not mention a protected class. Instead, he characterized the situation as a "personality conflict."

---

[1] Plaintiff's email did make one cursory reference to "retaliation." Specifically, plaintiff stated: "So, before I make any written charges (of retaliation) I certainly want to be positive about my reasons for making such a charge, and so going [sic] to wait and see what happens … ." Plaintiff, however, did not detail any statutorily protected activity, nor connect the possible retaliation to a statutorily protected class.

Regardless, plaintiff told Loewy he could not "further risk [his] mental and physical health" by working under Clermont and requested reassignment to another department. Plaintiff noted he had "been putting in" for other IC management positions since January 2012, but had thus far been unsuccessful.

On September 17, 2012, the day after plaintiff's email to Loewy, Clermont contacted Allan Rothwell, a Director of Human Resources, and informed him of "performance issues" with plaintiff. In response, Rothwell notified Clermont of plaintiff's complaints and request for a transfer.

Loewy responded to plaintiff's September 16 email via letter on September 21, 2012. She acknowledged Clermont had "not act[ed] consistent with IC's expectations regarding his managerial actions, methods of communications, or interactions with IC employees" and stated IC would "take appropriate corrective measures to ensure that similar conduct [was] not repeated."[2] She further informed plaintiff that his requested reassignment had to be "based on a merit selection process" pursuant to IC's regular hiring and promotion practices. She encouraged him, however, to "continue to apply for other positions."

According to the record, IC's personnel decisions are usually the result of departmental decision-making rather than top-down mandates from company-wide leadership. One or more senior managers within a relevant department, often re-

---

[2] Clermont was required to meet with Rothwell, who counseled Clermont on the need to control his "outbursts" and improve his communication style. The meeting was documented and placed in Clermont's personnel file.

ferred to as "hiring managers," independently control the interview and selection process, with advice and consultation from Human Resources.

Plaintiff sent another email to Loewy on September 28, 2012. His email emphasized that his September 16 transfer request "was not a complaint" and that "this letter [was] not a complaint either." Still, he raised "reservations" about finding a new management position "via [IC's] conventional methods" (plaintiff claimed to have unsuccessfully applied for approximately forty-five different job openings by that point). He further stated that during his time at IC, he had observed "many management employees … who got into a personality conflict with their superior, and were instantly given individual consideration and moved into an open position," effectively "bypassing the merit based selection process, protocol, and procedure."

IC acknowledges that, on occasion, a manager qualified for another position may circumvent the normal application process and laterally move to another department without a formal interview. Despite plaintiff's requests, however, no such transfer occurred in his case.

Plaintiff filed a formal complaint against Clermont via an email to Loewy on October 14, 2012, stating that "things have not gotten better with the personality conflict." Plaintiff stated the basis of his complaint was "four-fold": (1) Clermont "providing a continual hostile work environment"; (2) Clermont's retaliation against plaintiff "for previous complaints" and "testimony" in Loewy's HR investigation; (3) Clermont "disrespecting" plaintiff "by publicly mocking and ridiculing

[his] medical condition"[3]; and (4) Clermont "discrimi-nat[ing]" against plaintiff by "holding only [plaintiff] ac-countable with written negative consequences" for "alleged errors that everyone else makes." Once again, his complaint did not assert Clermont's actions were motivated by plain-tiff's age or national origin.

On October 15, 2012, the day after plaintiff filed his com-plaint, Clermont wrote a letter to plaintiff claiming his "work performance [was] unsatisfactory." Clermont outlined sev-eral instances of plaintiff's workplace failures, and warned if he failed to improve, "disciplinary action may result, up to and including … dismissal." This letter was placed in plain-tiff's personnel file.

In January 2013, Albert Nashman, IC's Assistant Vice President of Network Operations—also a Canadian citizen—decided to downsize the Homewood Motive Power Depart-ment and consolidate its functions at IC's facilities in Edmon-ton. At his deposition, Nashman testified that his decision was part of a company-wide effort to maximize efficiencies at IC's train dispatch centers. As a result, Clermont was reas-signed to Canada and plaintiff's position was eliminated. IC informed plaintiff of Nashman's decision on January 15, 2013. At that time, plaintiff was sixty years of age. Although he had remained unsuccessful in securing another IC management position (by that stage, he had supposedly applied to approx-imately sixty management openings), Voytechek offered him a non-management clerical job.

---

[3] Plaintiff does not bring a claim under either the Americans with Dis-abilities Act ("ADA"), 42 U.S.C. §§ 12101–213, or § 504 of the Rehabilita-tion Act of 1973, 29 U.S.C. § 794(a).

In a February 4, 2013 email to Voytechek, plaintiff requested that Voytechek review plaintiff's personal circumstances. Once again, he referred to IC's supposed practice "of placing displaced managers almost seamlessly into another department's management team." Also, for the first time, plaintiff referenced the ADEA, stating: "I maybe [sic] a member of a protected class under the Age Discrimination in Employment Act of 1967." The same day, Voytechek emailed Rothwell and asked him to respond to plaintiff on his behalf. Voytechek told Rothwell that "[t]he problem for [plaintiff] is not that there are no jobs in management available … but rather that no one 'wants' him."

Rothwell attempted to assist plaintiff in his job search. For example, in January 2013, Rothwell sent multiple emails to managers in other IC departments asking about potential job openings. Rothwell went so far as to request that plaintiff be interviewed ahead of other candidates. These efforts, however, proved unsuccessful.

On February 22, 2013, Rothwell emailed the Senior Human Resources Director in Canada. In his email, Rothwell described plaintiff as "a later career person" who "present[ed] poorly to hiring managers and [had] a personal view of his skills and abilities which [was] inconsistent to how others see him." Rothwell further stated plaintiff was "not one who takes feedback well." Rothwell shared his thoughts "in case [plaintiff] escalate[d] the matter."

Plaintiff's managerial job search remained unsuccessful and he began working in the clerical position on March 4, 2013. Still, Rothwell's placement attempts continued. On March 11, 2013, for instance, Rothwell told an IC hiring manager that plaintiff was still eligible for a management position

and that "[i]f he is qualified he should be interviewed." These efforts did not produce any tangible results.

On March 27, 2013, plaintiff sent another email to Loewy. Plaintiff complained Clermont's October 15th letter concerning plaintiff's job performance was "retaliatory" for plaintiff's prior complaints and was "adversely affecting" his job search.

In all, plaintiff alleges he applied to approximately eighty-two different management positions, all without success. Plaintiff further claims at least thirty-seven of those positions were filled by substantially younger candidates.

## B.  Procedural Background

Plaintiff filed a charge of discrimination with the Equal Opportunity Employment Commission ("EEOC") on December 30, 2013, claiming the elimination of his Motive Power position, his demotion to a non-management clerical job, and IC's refusal to hire him in another management-level position were the result of unlawful discrimination based upon his age and American citizenship. The EEOC issued a Notice of Right to Sue on March 26, 2015.

On June 17, 2015, plaintiff commenced the present action in the United States District Court for the Northern District of Illinois. Plaintiff brought claims against IC under both the ADEA and Title VII, alleging unlawful discrimination on the basis of age and national origin, respectively. Additionally, plaintiff claimed he was subjected to unlawful retaliation for reporting his complaints about Clermont.

The district court granted summary judgment to IC on April 12, 2017. This appeal followed.

## II. Discussion

We review a district court's grant of summary judgment de novo. *C.G. Schmidt, Inc. v. Permasteelisa N. Am.*, 825 F.3d 801, 805 (7th Cir. 2016). Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We "consider all of the evidence in the record in the light most favorable to the non-moving party, and we draw all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Feliberty v. Kemper Corp.*, 98 F.3d 274, 276–77 (7th Cir. 1996).

### A. Plaintiff's Retaliation Claim

To survive summary judgment on a timely retaliation claim, plaintiff must offer evidence of: "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (quoting *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 404 (7th Cir. 2007)).

Here, plaintiff did not engage in any statutorily-protected activity.[4] Statutorily-protected activity "requires more than

---

[4] The district court granted summary judgment by finding plaintiff's retaliation claim time barred. However, "we may affirm on any basis that appears in the record." *Kidwell v. Eisenhauer,* 679 F.3d 957, 965 n.1 (7th Cir. 2012).

simply a complaint about some situation at work, no matter how valid the complaint might be." *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 901 (7th Cir. 2016). Rather, "the complaint must indicate [that] discrimination occurred because of sex, race, national origin, or some other protected class." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Id.*

Our decision in *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134 (7th Cir. 1997), is instructive. There, a former employee of Mesirow Financial filed a suit alleging pregnancy discrimination, sexual harassment, and retaliatory discharge under Title VII. *Id.* at 1135. The record indicated the plaintiff's former manager utilized an "abrasive management style" that "was not calculated to win friends and influence people." *Id.* at 1136. The manager's "overbearing behavior" included "yelling, slamming down the phone, making nasty comments about clients, [and] talking down to his fellow workers." *Id.* Eventually, the plaintiff complained to management about the manager's "generally obnoxious conduct and difficult personality," but did not raise "*specific* concerns or allegations of sexual harassment." *Id.*

The plaintiff later alleged Mesirow terminated her in retaliation for her complaints. *Id.* at 1138. Affirming the district court's grant of summary judgment in favor of Mesirow, we held that "[i]n order to demonstrate a case of retaliatory discharge, a plaintiff must show that she opposed conduct prohibited by Title VII, or at a minimum that she had a 'reasonable belief' she was challenging such conduct." *Id.* at 1147

(quoting *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994)). We noted that although the plaintiff "did complain about [her manager's] management style[] in general terms[,] … she did not raise the subject of sexual harassment to anyone in authority." *Id.* Therefore, although the plaintiff may have *felt* the manager's objectionable behavior encompassed sexual discrimination, those feelings were "irrelevant" because she did not make them known to her employer. *Id.*

The same reasoning applies here. Nothing in plaintiff's complaints about Clermont suggests he was protesting discrimination on the basis of age or national origin. His multiple emails to Loewy in 2012 and 2013 do not reference those protected classes at all, either directly or indirectly. To the contrary, like the plaintiff in *Gleason*, plaintiff framed his complaint in general terms: he stated the issue was a mere "personality conflict" and described Clermont as an "abusive" supervisor who "berat[ed], badger[ed], and disrespect[ed]" his subordinates. He never suggested that Clermont acted with unlawful discriminatory animus. This is not enough to satisfy either ADEA or Title VII strictures.[5] Plaintiff's retaliation claim accordingly fails.

------

[5] At oral argument, plaintiff focused heavily upon his February 4, 2013 email to Voytechek and his March 27, 2013 email to Loewy. This reliance is misplaced. Although plaintiff's February 4 email specifically referenced the ADEA, it had nothing to do with plaintiff's complaints about Clermont. Indeed, by that point, the Homewood Motive Power Department had been eliminated and Clermont reassigned to Canada. Moreover, the email only declared plaintiff's potential membership in a protected class—a fact likely already known by Voytechek. Plaintiff did not further allege that any of IC's actions were motivated by such a connection. Similarly, although plaintiff's March 27 email characterized Clermont's October 15th letter regarding plaintiff's job performance as "retaliatory," this alone

### B. Plaintiff's Discrimination Claims

#### 1. *Plaintiff's ADEA Claim*

"Congress enacted the ADEA in 1967 to 'promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment.'" *Carson v. Lake County., Ind.*, 865 F.3d 526, 532 (7th Cir. 2017) (alteration in original) (quoting 29 U.S.C. § 621(b)). The statute protects workers forty years of age and older and "makes it unlawful for an employer … 'to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *Id.* (quoting 29 U.S.C. § 623(a)(1)).

Because plaintiff seeks to recover under a theory of disparate treatment, he must "prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Id.* (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)). In other words, "in the ADEA context, it's not enough to show that age was *a* motivating factor. The plaintiff must prove that, but for his age, the adverse action would not have occurred." *Martino v. MCI Commc'ns Serv., Inc.*, 574 F.3d 447, 455 (7th Cir. 2009). "In this

---

does not establish a sufficient factual nexus to plaintiff's membership in a protected class. Plaintiff "need not use … magic words" to grant his speech statutory protection, but he "'has to at least say something to indicate [his age or national origin] is an issue.'" *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003) (quoting *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007–08 (7th Cir. 2000)).

respect, the ADEA is narrower than Title VII … as Title VII also protects against mixed-motive discrimination." *Carson*, 865 F.3d at 532.

An ADEA plaintiff may satisfy this burden through two methods. First, she "may proceed by introducing direct or circumstantial evidence that her employer took an adverse action against her because of her age." *Id.* at 532–33. Alternatively, she may use the *McDonnell Douglas* "burden shifting framework." *Id.* at 533 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this approach, the plaintiff must show evidence that "(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Id.* (quoting *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016)). If the plaintiff meets each element of her prima facie case, "the burden shifts 'to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" *Id.* (internal quotation marks omitted) (quoting *Simpson*, 827 F.3d at 661). "However the plaintiff chooses to proceed, at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action *because of* her age." *Id.*; *see also Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) ("Th[e] legal standard … is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [age] caused the discharge or other adverse employment action. Evidence must be considered as a whole … .").

Here, plaintiff points to the following as evidence of age discrimination: (1) statements made by IC personnel; (2) deviations from IC's stated hiring practices; (3) preferential treatment of younger IC employees; and (4) evidence of pretext. We address each in turn.

### a. Statements Made by IC Personnel

#### i. Statement by Voytechek

Plaintiff first highlights that Voytechek asked him how old he was when he interviewed for the Motive Power Supervisor position in February 2011. Voytechek disputes this point, but on review of summary judgment, we must assume he asked that question. Nevertheless, the incident does not, by itself, directly support an inference of discrimination here because it was neither asked around the time of IC's challenged decisions nor made in reference to the relevant adverse employment actions. *See Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007), *overruled on other grounds by Ortiz*, 834 F.3d 760. Rather, Voytechek's question came more than two years before plaintiff's Motive Power position was eliminated, and from a person who actually promoted plaintiff at the age of fifty-eight. Standing alone, each of these facts may not be enough to undermine plaintiff's claim. When considered together, however, they remove any probative value Voytechek's question might have added to plaintiff's proffered evidence of unlawful intent. In short, Voytechek's question about plaintiff's age is unavailing.

#### ii. Statements by IC Hiring Managers

Plaintiff next points to remarks by various IC hiring managers after rejecting his applications for assorted managerial openings: (1) when plaintiff applied for the Safety

Officer position, a hiring manager believed plaintiff "would not respond well to the need for additional training"; (2) when plaintiff applied for the Manager of Truck Owner Operators position, another hiring manager thought a different candidate (who happened to be younger) would be "a little faster" at grasping certain aspects of the job; (3) the hiring manager who interviewed plaintiff for the Benefits Administrator—Attendance Management position noted plaintiff was "low energy"; and (4) the hiring manager filling the Terminal Coordinator position noted that a candidate (not plaintiff) "was very close to retirement and looked to be using the opportunity to get back to Michigan … so he could retire."

Plaintiff attributes each of these comments to bias against his age. We disagree. As the district court noted, these statements are innocuous when viewed in context. *See Baker v. Silver Oak Senior Living Mgmt. Co.*, 581 F.3d 684, 688 (8th Cir. 2009) (recognizing that statements made in an ADEA case "must be viewed in … context"). For example, as to plaintiff's anticipated response to extra training, the hiring manager's evaluation derived not from plaintiff's age, but the fact that plaintiff "presented as somewhat over-confident regarding his own knowledge and abilities." Indeed, according to the manager's sworn affidavit, he did not even know plaintiff's age at the time of his interview. Plaintiff offers nothing to rebut this contention.

As to the belief that an alternate candidate would be "a little faster" than plaintiff at the Manager of Truck Owner Operators position, the hiring manager explained his decision-making process at his deposition:

> It was my impression that [the other candidate]
> would grasp some of the aspects of the job a lit-
> tle faster than [plaintiff] … [b]ased on … my
> overall impression on how they would do. A lot
> of aspects to this job, a lot of different things that
> you have to be able to manage and accomplish,
> and my impression was that [the other candi-
> date] … would be slightly more quick in grasp-
> ing all these different parts of the job, as op-
> posed to … [plaintiff] I thought would take a lit-
> tle bit more time.

Nothing in the manager's evaluation is attributed to plain-
tiff's age. Therefore, as the district court noted, plaintiff's "as-
sumption that [the] comments were based on Plaintiff's age
versus his intelligence, skills, or simply Plaintiff's behavior
during the interview has no basis in the record."

The hiring manager for the Benefits Administrator—
Attendance Management position similarly explained his
assessment of plaintiff's "low energy," stating he did not
"recall that there was much energy in the interview" and that
the "conversation was just very plain … in tone and in
response." Once again, nothing indicates the manager's
evaluation derived from plaintiff's age.

Plaintiff argues he deserves the benefit of inferences
drawn from the evidence. Although this may generally be the
case, "we make only reasonable inferences, not every conceiv-
able one." *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724,
730 (7th Cir. 2014). Indeed, "our favor toward the nonmoving
party does not extend to drawing '[i]nferences that are sup-
ported by only speculation or conjecture.'" *Argyropoulos v.
City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (alteration in

original) (quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008)). In the end, plaintiff's proffered theory is too divorced from the factual record to create a genuine issue of material fact.

That leaves the statement about another IC candidate being "close to retirement." From the outset, the probative value of a comment concerning a separate, unrelated employee is limited at best. Regardless, the observation, which was made in an email to a Human Resources Associate, appears benign when read in conjunction with the remainder of the hiring manager's remarks:

> We can check into [the relevant candidate] also. When I originally looked at his information I saw that he was very close to retirement and looked to be using the opportunity to get back to Michigan (where he lives) so he could retire. *But I need the help so if he looks okay to you, let's set it up!*

(emphasis added). Moreover, we recently held that courts cannot necessarily "equate retirement eligibility with age" because "eligibility for retirement may be based on age, years of service, or a combination of the two." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 229 (7th Cir. 2017). The Supreme Court has stated that "age and years of service are analytically distinct," and therefore "an employer can take account of one while ignoring the other." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993). Here, plaintiff "has not identified any record evidence that explains how retirement eligibility is determined." *David*, 846 F.3d at 229. Thus, without more, we cannot equate the hiring manager's comments

about an employee's impending retirement with an inappro-priate focus on age.

In sum, plaintiff's reliance upon the various statements by IC hiring managers is inapposite.

### iii.    Statement by Rothwell

Finally, plaintiff highlights Rothwell's description of plaintiff in February 2013 as a "later career person." As with the term "close to retirement," however, this is not an inevi-table euphemism for old age. *See Wilson v. Lear Corp.*, 2 F. App'x 576, 580 (7th Cir. 2001) ("An 'early career person' designation does not necessarily refer to age."). Regardless, in his role as Director of Human Resources, Rothwell did not possess final decision-making authority over plaintiff's de-motion to a non-management clerical job or IC's refusal to hire him in another management-level position. "Normally, statements by a nondecisionmaker do not satisfy a plaintiff's burden of proof in an employment discrimination case." *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1010 (7th Cir. 2000). In addition, the record simply does not support attrib-uting Rothwell with discriminatory animus. To the contrary, the evidence shows Rothwell made repeated efforts to assist plaintiff in his job search, even after plaintiff formally ac-cepted the clerical position in March 2013. Indeed, Rothwell went so far as to request that plaintiff be interviewed *ahead* of other candidates.[6] Rothwell's "late career" remark, therefore, does not help satisfy plaintiff's burden of proof.

---

[6] Although Rothwell critiqued plaintiff in his February 22, 2013 email, his thoughts were only shared with the Senior Human Resources Director, not a hiring manager. Moreover, Rothwell noted at the time that he was forwarding the information "in case [plaintiff] escalate[d] the matter"

### b. *Deviations from IC's Hiring Practices*

In addition to the statements made by IC personnel, plaintiff also claims the company engaged in "significant and unexplained" deviations from its established hiring practices. *See Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012) ("Significant, unexplained or systematic deviations from established policies or practices can no doubt be relative and probative circumstantial evidence of discriminatory intent."). Specifically, plaintiff argues that IC's United States policy was to interview "all qualified candidates" for open positions, yet plaintiff did not receive interviews for a number of his management applications.[7]

However, plaintiff has not adequately shown he was qualified for a majority of the eighty-two positions for which he supposedly applied. "Neither the district court nor this Court is obligated in considering a motion for summary judgment to assume the truth of a nonmovant's conclusory allegations on faith or to scour the record to unearth material factual disputes." *Carter v. Am. Oil Co.*, 139 F.3d 1158, 1163 (7th Cir.

---

within the company, not to prevent plaintiff from securing a managerial position.

[7] Plaintiff's description of IC's hiring practices derives from a single June 2013 email sent by an IC Human Resources Manager stating that "[a]ll people who are qualified for [an open] position must be interviewed." As the district court noted, however, plaintiff's interpretation is suspect. For one, the existence of such a policy was disputed by another Human Resources Manager as well as Rothwell. Moreover, actual enforcement for certain job openings would almost certainly be untenable—the record indicates IC received over 500 applications for one of the positions to which plaintiff applied. Nevertheless, at this juncture, we must construe all evidence in the light most favorable to plaintiff. *See Feliberty*, 98 F.3d at 276–77.

1998). Moreover, it is undisputed that plaintiff *was* interviewed for a number of openings. Indeed, for at least one position, plaintiff was interviewed on more than one occasion. This places the true extent of IC's supposed deviations in doubt.

Plaintiff also references IC's alleged failure to comply with a consent decree in an unrelated case involving allegations of racial discrimination. The district court properly deemed this argument a "nonstarter." The consent decree derives from a 2010 case to which plaintiff was not a party, and does not seek to remedy discrimination on the basis of either age or national origin. Consequently, it has no bearing on the claims at issue here.

### c.  Preferential Treatment of Younger Employees

Plaintiff next argues younger IC employees were "systematically" given preferential treatment. In particular, he points to thirty-seven younger employees (individuals in their twenties, thirties, or forties) who were offered management-level positions for which he applied. True, circumstantial evidence of discrimination may include "evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment." *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 530 n.4 (7th Cir. 2008) (quoting *Hemsworth*, 476 F.3d at 491). However, while "they need not be identical in every conceivable way," similarly situated employees "must be 'directly comparable' to the plaintiff 'in all material respects.'" *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (quoting *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009)). This is because the similarly situated inquiry is meant to establish "whether all things are in fact equal." *Filar v. Bd. of Educ. of City of*

*Chi.*, 526 F.3d 1054, 1061 (7th Cir. 2008). The purpose of the inquiry "is to eliminate other possible explanatory variables, 'such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable'—discriminatory animus." *Coleman*, 667 F.3d at 846 (quoting *Humphries,* 474 F.3d at 405).

As a result, "[t]here must be 'enough common factors … to allow for a meaningful comparison in order to divine whether intentional discrimination was at play.'" *Id.* at 847 (alteration in original) (quoting *Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 560 (7th Cir. 2007)). Although the "number [of relevant factors] depends on the context of the case," *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000), *overruled on other grounds by Ortiz*, 834 F.3d 760, "[i]n the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Coleman*, 667 F.3d at 847 (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

Plaintiff makes no such showing here. His comparator evidence consists solely of a table listing the names and ages of the thirty-seven younger employees and the positions for which they were hired. Plaintiff provides no amplifying detail of the employees' qualifications or employment history that would allow this Court to comfortably conclude their hiring was the result of discriminatory motive rather than some other explanatory variable. Ultimately, plaintiff bears the burden of showing the individuals he identifies are similarly situated. *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680

(7th Cir. 2002) (holding that "we cannot compare [an em-ployer's] treatment of [a plaintiff] and [a co-worker]" if the plaintiff "fail[s] to meet her burden of establishing that [the co-worker] is a similarly situated employee"). Because plain-tiff fails to do so, his comparator argument must fail.

### d.   Evidence of Pretext

Even if we assumed, *arguendo*, that plaintiff established a prima facie case, IC has offered legitimate, nondiscriminatory reasons for its refusal to hire plaintiff in another managerial role: he either was not qualified for the positions at issue or the individuals ultimately hired were better candidates. To show these reasons are pretextual, plaintiff "must present ev-idence suggesting that the employer is dissembling." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). "The question is not whether the employer's stated reason was in-accurate or unfair, but whether the employer honestly be-lieved the reasons it has offered to explain the discharge." *Id.* "[I]t is not 'the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the em-ployer's proffered reason was pretextual, meaning that it was a lie.'" *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005) (quoting *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000)). "To meet this burden, [plaintiff] must 'identify such weaknesses, implausibilies, inconsistencies, or contra-dictions' in [IC's] asserted reason[s] 'that a reasonable person could find [them] unworthy of credence.'" *Coleman*, 667 F.3d at 852 (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).

Plaintiff argues that IC's proffered justifications are dubi-ous for multiple reasons, none of which are persuasive. First,

he highlights that Voytechek described plaintiff as "a good interviewer" after he was hired for the Motive Power Supervisor position, but Rothwell told the Senior Human Resources Director that plaintiff "present[ed] poorly to hiring managers." According to plaintiff, if a jury believed Voytechek, "it could infer dishonesty from Rothwell and the hiring managers." Not so. As the district court stated, "when an individual applies to 82 positions, conflicting impressions about Plaintiff's experience or abilities with respect to different positions [are] hardly unexpected and cannot support a basis for finding intentional discrimination."

Plaintiff also focuses heavily upon Martyn Peterson, the IC hiring manager who interviewed plaintiff for the Manager of Truck Owner Operators position in early 2013. At his deposition, Peterson testified that he evaluated plaintiff (as well as other candidates) through the use of his own personal rating system. This rating system contained nineteen traits Peterson felt were the most important for the position, including, *inter alia*: mechanical aptitude, knowledge of Department of Transportation regulations, ability to follow directions, and enthusiasm. Peterson testified that, after each interview was conducted, he scored the candidate in each category on a scale of one to ten. Of the three candidates Peterson interviewed, plaintiff received the lowest score.

Plaintiff now criticizes Peterson's rating system. First, he contends Peterson was dishonest about using the system in the first place because he did not produce the relevant scores to Human Resources until after plaintiff filed his EEOC complaint. The record indicates, however, that Peterson was the sole decision-maker regarding which candidates were interviewed and ultimately hired—Human Resources simply

served in an advisory role. Peterson further testified that Human Resources never requested copies of his notes or other interview materials at the time a candidate was originally hired. It is unsurprising, therefore, that Peterson would keep his personal rating system private until a situation (such as the filing of an EEOC complaint) required him to share it with another department.

Plaintiff also deems Peterson's rating system suspicious because Peterson testified he only took "a smattering of notes" during interviews and discarded them after a position was filled, but was able to produce a detailed scorecard after plaintiff filed his EEOC complaint. During his deposition, however, Peterson went out of his way to distinguish between materials produced *during* an interview and those created *after* an interview was completed; plaintiff improperly conflates the two. Peterson's practice of taking "a smattering of notes" that were later discarded applied only to the former. As to the latter, Peterson testified he routinely created a spreadsheet of his scores for each candidate and maintained it on his computer long after a position was filled.

### e.  Considering the Evidence as a Whole

As a final aside, plaintiff claims that in granting summary judgment, the district court merely "view[ed] the evidence as unconnected fragments" and "fail[ed] to consider the evidence as a whole." Of course, as noted above, "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Ortiz*, 834 F.3d at 765. Plaintiff's view of the district court's analysis, however, is misplaced. Indeed, the district court's opinion explicitly states:

> *Considering the evidence as a whole*, the Court con-
> cludes that no reasonable factfinder could con-
> clude that Plaintiff's age constituted the but-for
> cause of either the elimination of Plaintiff's po-
> sition in the Motive Power Department, or his
> inability to secure another management posi-
> tions despite his having applied for dozens of
> openings.

(emphasis added).

Regardless, even though we take "a fresh look at the rec-
ord," *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 837 (7th
Cir. 2014), our renewed consideration does not offer plaintiff
any relief. "At the end of the day, the question is simply
whether 'the same events would have transpired' if [plaintiff]
'had been younger than 40 and everything else had been the
same.'" *Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009)
(quoting *Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir. 1994)).
Based upon the discussion above, the answer is yes. As such,
the evidence presented below does not permit a reasonable
factfinder to conclude plaintiff's age caused the adverse em-
ployment actions at issue here.

### 2. *Plaintiff's Title VII Claim*

Turning briefly to plaintiff's Title VII discrimination claim,
we agree with the district court that there is no evidence that
IC's actions were taken because of plaintiff's national origin.
Plaintiff seemingly recognizes this fact as well; his fifty-three
page brief devotes only one page to his Title VII claim. Plain-
tiff merely points to the fact that he is American while his IC
supervisors—namely Clermont, Voytechek, and Nashman—

were Canadian. This fact, standing alone, does nothing to advance plaintiff's case. An unlawful employment practice is established under Title VII only when a plaintiff demonstrates that a particular protected characteristic was a motivating factor for an employment decision. *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 860 (7th Cir. 2007). Plaintiff has wholly failed to make such a showing here.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.