In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 20-1374

ANNE MARNOCHA,

*Plaintiff-Appellant*,

*v.*

ST. VINCENT HOSPITAL AND HEALTH CARE CENTER, INC.
and ST. VINCENT CARMEL HOSPITAL, INC.,

*Defendants-Appellees*.

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 18-cv-02714 — **James R. Sweeney, II**, *Judge*.

———————————

ARGUED DECEMBER 3, 2020 — DECIDED JANUARY 22, 2021

———————————

Before SYKES, *Chief Judge*, FLAUM, and ST. EVE, *Circuit Judges*.

FLAUM, *Circuit Judge*. On the heels of her termination, plaintiff-appellant Dr. Anne Marnocha brought this claim against defendants-appellees St. Vincent Hospital and Health Care Center, Inc. and St. Vincent Carmel Hospital, Inc. (collectively "St. Vincent"), asserting age discrimination claims under the Age Discrimination in Employment Act ("ADEA"),

29 U.S.C. § 621 *et seq.* On appeal, Marnocha challenges the district court's grant of St. Vincent's motion for summary judgment, alleging that genuine issues of material fact precluded summary judgment on both her termination and failure to hire claims. Apart from a minor factual error in the district court's opinion, we agree that no genuine dispute of material fact exists for either claim. Summary judgment was therefore appropriate, and we affirm.

## I. Background

A Neonatal Intensive Care Unit ("NICU") offers specialized care for hospitals' youngest and smallest patients. Based on services and care offered, NICUs have four levels. Level I NICUs are normal newborn nurseries, Level II NICUs treat mildly sick infants, Level III NICUs provide assisted ventilation while also caring for critically ill babies, and Level IV NICUs treat babies in need of the highest level of care, including Extracorporeal Membrane Oxygenation and pediatric surgical interventions.

As a board-certified doctor in pediatrics and neonatal-perinatal medicine, Marnocha focused on the medical care of newborn infants, especially ill or premature infants. Marnocha received her license in 1981 and joined St. Vincent's Hospital on 86th Street in Indianapolis, Indiana ("86th Street") in 1987. St. Vincent brought Marnocha in to develop this NICU into a Level III facility, and during her tenure, the NICU advanced to a Level IV facility.

When St. Vincent began building a perinatal service program at its Carmel, Indiana campus ("Carmel") with the goal of establishing a Level II, and eventually a Level III, NICU, Marnocha was appointed to run the program. Marnocha

transferred to the Carmel location in April 2003 when it opened. She worked there part-time until 2005, when she transitioned to full-time after the Carmel NICU became a Level III facility. Marnocha worked at the Carmel NICU until her termination in 2018.

In February 2017, Dr. Hossain Marandi began serving as the President of Peyton Manning Children's Hospital and the Executive Director of the pediatric service line for St. Vincent in Indiana. Marandi's supervisory authority – including the authority to hire and fire – covered both the NICUs at Carmel and at 86th Street. In June 2017, Marandi concluded there were too many neonatologists on staff, a conclusion supported by self-identified issues concerning the full-time equivalencies ("FTEs") of 86th Street neonatologists. In formulating his restructuring plan, Marandi reviewed workflows and schedules, before deciding by September 2017 to terminate the Carmel neonatologists and expand the responsibilities of the 86th Street neonatologists to cover the Carmel NICU as well. Although Marandi did share his finalized decision to restructure with several colleagues, he maintains the evaluation and decision were solely his.[1]

At the time of the restructuring, Carmel employed five full-time neonatologists: Marnocha (age 62), Dr. Catherine

---

[1] Colleague disagreement had no impact on Marandi's restructuring decision. In late summer 2017, Marandi informed several others of his overstaffing concerns and his plan to reduce the number of neonatologists. The group of several doctors and one nurse with whom Marandi spoke told him that St. Vincent was appropriately staffed. At that time, Marandi did not include any Carmel neonatologists in these discussions and did not publicize his intent to eliminate Carmel neonatologists and expand coverage of 86th Street neonatologists.

Watts (age 58), Dr. Nancy Lemear (age 53), Dr. Kem Templeton (age 59), and Dr. Melissa Landis (age 35). During this same period, 86th Street employed sixteen neonatologists and hospitalists who had been employed there less than five years. Additionally, twenty of the thirty-two physicians in those positions at 86th Street were over forty years old. Although certified as a Level III facility, only two percent of babies treated at Carmel in 2017 and 2018 qualified for Level III care. By contrast, the "extremely ill babies" at the Carmel NICU were transferred to 86th Street, a NICU certified for Level IV care. Given this divide, Marandi assumed the 86th Street neonatologists could cover Carmel's NICU, but the Carmel neonatologists could not necessarily provide the Level IV care required at 86th Street.

Marandi's plan to restructure and eliminate the Carmel neonatologists triggered Human Resources ("HR") involvement. Kellie Harris, an HR employee, proactively set a meeting with Marandi to talk about his plan to restructure — referred to as his "neonatologist request" — as well as discuss his business needs and understand the rationale behind the planned changes. Standard restructure review required Harris to assess the impact on the entire targeted group, including a risk assessment "to make sure that any business decisions [were not] based off of specifics to an individual and that [they are] specific to the organizational needs." For purposes of the HR review, the "targeted" and "impacted" group included not only the five neonatologist positions at Carmel but also twenty-two neonatologists and ten hospitalists at 86th Street, described by HR as "everyone with the same responsibilities in the departments that we looked at." This review grouping accorded with St. Vincent's standard HR practice "to look at

everyone that is included in targeted group as one whole department."

Harris and Marandi provided inconsistent testimony regarding whether St. Vincent had a preference for retaining Carmel's youngest neonatologist, Landis. Harris testified that she and Marandi discussed moving Landis from Carmel to 86th Street and amending her contract rather than terminating and rehiring her. Marandi, however, denied that any discussion about retaining Landis took place or that anyone expressed a preference for retaining her. Harris also testified as to discussions about Carmel neonatologists' past Level IV NICU experience, but Marandi again denied having any knowledge of "the level of experience that the [neonatologists] at Carmel had in regards to working at a Level 4 facility."

Marandi's plan to restructure and eliminate was carried out as intended: All Carmel neonatologists were fired, while the 86th Street group was tasked with covering the Carmel NICU. On January 5, 2018, Marandi discharged Marnocha. In contrast to his deposition testimony that he had no knowledge of the Carmel neonatologists' Level IV experience, Marandi purportedly told Marnocha that she and the other Carmel neonatologists were being terminated for lack of recent Level IV training.

Marandi told Marnocha there were twenty-two neonatologists at 86th Street, but St. Vincent needed twenty-three. All five of the newly terminated Carmel neonatologists were eligible to apply for the remaining opening. Sensitive to Marnocha's surprise about her termination, Marandi was receptive to input about the makeup of the interview panel for the open neonatologist position. The parties dispute who picked the

panel members: Marandi asserts that Marnocha selected most of the panel, while Marnocha maintains she did not suggest the panelists.

The six-person interview panel, informally led by Dr. Taha Ben Saad in his role as the division director of neonatology, included: Dr. Melissa Leedy, neonatologist and physician lead for pediatric transport; Dr. Ina Whitman, neonatologist at 86th Street; Nurse Stacey Yeo, nurse supervisor and neonatal nurse practitioner; Dr. Amy Moon-Holland, OB-GYN; and Dr. Jeffrey Rothenberg, Chief Medical Officer of the 86th Street campus of St. Vincent Hospital.[2] The panel was charged with interviewing and making recommendations but not with contracting or hiring the recommended individual. Four of the five terminated Carmel neonatologists interviewed for the open position: Templeton, Watts, Marnocha, and Landis. Throughout the formal interview process, the interviewers took notes and individually filled out an informal questionnaire, which included eight categories: educational background, prior work experience, technical qualifications, verbal communication, enthusiasm, knowledge of company, team building/interpersonal, and initiative. The interviewers first submitted their interview sheets to Ben Saad before "caucus[ing]" as a group to discuss their views of the candidates.

---

[2] The district court opinion incorrectly stated Rothenberg was not on the panel. This error does not impact our analysis, contrary to Marnocha's arguments. Typographical errors do not mandate reversal when it is apparent that the district court properly understood the facts and considered the arguments. *See United States v. Marion*, 590 F.3d 475, 476 n.1 (7th Cir. 2009). From the context of the district court opinion, the district court understood and considered the case. Therefore, we find the misstatement at issue was nothing more than a typographical error.

There was no need for a formal vote or even extensive group discussion, as the panelists unanimously agreed that Landis was the best candidate.

The interviewers articulated clear reasons for preferring Landis. The 86th Street NICU is a "very large, big, busy NICU" requiring a "kind of high energy person to be able to do the job." Given the slower paced environment at Carmel, the interviewers focused on how each candidate planned to transition from a nursery with an average daily count of less than ten babies to a NICU with an average daily count between sixty and seventy babies. Landis was ready with her plan. Building on her recent fellowship training at a nationally recognized NICU, Landis came prepared for her interview. She had researched surgical protocols and ventilation procedures used in Level IV NICUs—thus showing initiative the interviewers perceived as demonstrating enthusiasm and preparedness for the challenge of transitioning to a higher acuity and busier NICU. Bolstering the interviewers' conclusion, evaluators also pointed to Landis's positive attitude and aptitude for patient interaction.

In stark contrast, the interviewers' consensus on Marnocha was lukewarm, at best. Marnocha relied almost exclusively on her less-recent Level IV experience, failing to articulate how she would transition to a higher acuity and busier NICU. According to Whitman, Marnocha "[d]id not have [a] cogent plan for making the transition" from Carmel to 86th Street. Of particular concern to the interview panel, Marnocha said she did not think much had changed in the fifteen years since she had worked in a Level IV NICU. Furthermore, while crediting Marnocha's technical competence, panelists raised

concerns about her on-the-job interpersonal skills and approach to patient care.

On later review, despite this group consensus, responses on individual interview questionnaires raised questions. During Marnocha's interview, Rothenberg made a note to himself that she was "at end of career." Rothenberg later testified that this note meant "that [Marnocha] was toward the end of her career as opposed to Dr. Landis who was toward the beginning of her career," and that as an administrator, he "want[ed] to build for 20, 30 years in the future, not just for the next five years." Rothenberg said in reaching his own decision he "would be remiss if [he] didn't take both immediate needs as well as future needs into account when hiring." However, Rothenberg's "clear-cut" preference for Landis derived not solely from long-term planning but also from the impression, after interviewing, that "if [he] had to choose one of these four to take care of [his] own child, Dr. Landis would be [his] first choice." Furthermore, Rothenberg did not recall talking to his fellow interviewers about his forward-thinking projections. Nor did the other interviewers affirmatively state Rothenberg did so. The record does not indicate that Rothenberg shared any age-based bias during the interview process.[3]

St. Vincent hired Landis for the open position in February 2018. As other 86th Street additions, Dr. Hilary White (age 37) was hired in early 2017, before Marandi's arrival and before the restructuring, to fill a neonatology position left open by a departing employee, and Dr. Kelsey Montgomery (age 36)

---

[3] The only interview panelist asked about Rothenberg's "end of career" note, Whitman, "honestly [did not] recall him discussing that."

was brought on in August 2018 after being offered future employment, pending completion of her pediatric fellowship. These final two additions were the product of decisions made well before, and unrelated to, Marandi's restructuring plan.

Marnocha filed suit against St. Vincent, alleging violations of the ADEA. Specifically, Marnocha alleged that St. Vincent discriminated against her on the basis of her age by terminating her employment as a neonatologist and not hiring her for the open neonatologist position. St. Vincent moved for summary judgment. The district court granted the motion its entirety, concluding that no reasonable trier of fact could find that St. Vincent terminated or failed to hire Marnocha based on her age.

Marnocha now appeals.

## II. Discussion

"We review a district court's grant of summary judgment de novo." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Skiba*, 884 F.3d at 717 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A theory "too divorced from the factual record" does not create a genuine issue of material fact. *Id.* at 721. "Although we construe all facts and make all reasonable inferences in the nonmoving party's favor, the moving party may succeed by showing an absence of evidence to support the non-moving party's claims." *Tyburski v. City of Chicago*,

964 F.3d 590, 597 (7th Cir. 2020) (citation and internal quotation marks omitted).

Recognizing the challenges facing older workers attempting to retain or regain employment, Congress enacted the ADEA in 1967 to "promote employment of older persons based on their ability rather than age," "prohibit arbitrary age discrimination in employment," and "help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(a)(1), (b). The statute extends protection to workers forty years of age and older, making it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *Carson v. Lake County, Indiana*, 865 F.3d 526, 532 (7th Cir. 2017) (quoting 29 U.S.C. § 623(a)(1)).

The ADEA prohibits disparate treatment, where "liability depends on whether the protected trait … actually motivated the employer's [adverse] decision." *Id.* (alteration in original) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). When a plaintiff seeks to recover under a theory of disparate treatment, as Marnocha does here, she "must prove, by a preponderance of the evidence, that age was the but-for cause of the challenged adverse employment action." *Skiba*, 884 F.3d at 719 (citation and internal quotation marks omitted). In other words, "[t]o recover under a theory of disparate treatment in the ADEA context, 'it's not enough to show that age was *a* motivating factor. The plaintiff must prove that, but for [her] age, the adverse action would not have occurred.'" *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367 (7th Cir. 2019) (quoting *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454

(7th Cir. 2018)); *see also Gross v. FBL Fin. Servs.*, 557 U.S. 167, 176–78 (2009) (explaining but-for causation standard for ADEA disparate treatment claims).

Following our decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), courts must evaluate all evidence together as a whole, whatever the source. *Id.* at 766. A plaintiff may prove but-for causation either "by introducing direct or circumstantial evidence that her employer took an adverse action against her because of her age" or by invoking the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Carson*, 865 F.3d at 532–33. The *McDonnell Douglas* burden-shifting framework requires plaintiff show: "(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Id.* at 533 (quoting *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016)). If the plaintiff establishes this prima facie case, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (citation and internal quotation marks omitted).

Regardless of which path to proof a plaintiff takes, "at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action *because of* her age." *Id.*

### A. Termination Claim

Marnocha first alleges that St. Vincent unlawfully terminated her employment in violation of the ADEA. On appeal, Marnocha challenges the district court's grant of summary judgment on her termination claim, arguing that the court erred both in determining that she could not satisfy the "similarly situated" prong of her prima facie case and in rejecting evidence that St. Vincent's reasons for terminating her were pretext for age discrimination.

We approach Marnocha's termination claim as presented – through the lens of the *McDonnell Douglas* framework. Of the framework's four prongs, St. Vincent conceded that Marnocha satisfied the first three: she was over forty and part of a protected class, she met St. Vincent's legitimate expectations, and she suffered an adverse employment action. The district court's grant of summary judgment therefore turned on whether similarly situated employees under the age of forty were treated more favorably. In evaluating the similarly situated prong, the district court limited the relevant comparators to the terminated Carmel neonatologists. Marnocha argues that this action "impermissibly narrowed the scope" of her comparators. We disagree.

"All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. The 'similarly situated' prong establishes whether all things are in fact equal." *McDaniel*, 940 F.3d at 368 (quoting *Filar v. Bd. of Educ. of City of Chi.*, 526 F.3d 1054, 1061 (7th Cir. 2008)). The purpose of the similarly situated prong is to "eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the

critical independent variable – discriminatory animus." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (citation and internal quotation marks omitted). While similarly situated parties need not be "identical in every conceivable way," they "must be directly comparable to the plaintiff in all material respects." *Id.* (internal quotation marks omitted).

The district court held that Marnocha failed to carry her burden with respect to the similarly situated prong. It concluded that "[s]he does not provide the ages, work history, performance reviews, supervisors, or qualifications of the doctors at 86th Street, leaving the Court to speculate as to whether age or some other legitimate consideration caused the 86th Street neonatologists to retain their positions." Marnocha argues that the district court "did not consider all evidence in the record in a light most favorable to [her]" and did not "draw all reasonable inferences in her favor." She contends that these errors left her with an "improperly narrowed" pool of comparators, a pool which excluded the 86th Street neonatologists. Despite the lengthy arguments centered on the similarly situated prong, we reject Marnocha's position for the simple reason that the neonatologists employed at Carmel and the neonatologists employed at 86th Street are *not* comparable in all material respects. While we therefore agree with the district court's judgment, we see no need to look beyond the differences in work environment to find material lack of comparability. The two work environments are distinct, varying by NICU level, acuity, and pace. Given these distinctions, the Carmel neonatologists represent the proper comparators.

Marandi, the sole decision maker, designed and executed a restructuring plan with these differences in mind. Even accepting Marnocha's claims that St. Vincent contemplated transferring Landis to 86th Street as true, there is no ambiguity in the events that transpired: Similarly situated employees under the age of forty were *not* treated more favorably. Marandi fired all five Carmel neonatologists and gave all five the identical opportunity to apply for the opening at 86th Street. There is no genuine dispute of fact that the comparators here were treated identically, so summary judgment was proper.

Attempting to counter this conclusion, Marnocha contends that the district court erred in its application of the similarly situated standard for Reduction in Force ("RIF") cases outlined in *Collier v. Budd Co.*, 66 F.3d 886 (7th Cir. 1995), which, by her formulation, requires only a "show[ing] that younger employees were treated more favorably." Marnocha maintains that had the district court applied this standard, it would have identified a genuine issue of material fact sufficient to preclude summary judgment. Finding *Collier* not dispositive in our summary judgment holding, we disagree.

The language in *Collier* clarifies, rather than supplants, the *McDonnell Douglas* framework in RIF cases. RIF cases encompass workforce reductions or restructurings that do not involve "simply hir[ing] a new person to fill the discharged employee's old position." Instead, "jobs are often consolidated and/or work is shifted to other existing employees." *Id.* at 890. We have therefore held that "the fourth element of the prima facie case in RIF cases is not that the employee was replaced by a younger employee but that younger employees were treated more favorably." *Id.* at 890–91 (citations and internal quotation marks omitted). However, *Collier* simply clarifies

the articulated RIF standard, a standard that was intended to be "consistent with the *McDonnell Douglas* approach." *Id.* at 891. Accordingly, the RIF standard does not erase the "similarly situated" requirement from the fourth prong. *Cf. Bellaver v. Quantex Corp.*, 200 F.3d 485, 495 (7th Cir. 2000) (distinguishing between a mini-RIF and a true RIF, noting that the "similarly situated employee" requirement is waived only for a mini-RIF). In *Collier*, it was a given that the alleged comparators were similarly situated; in the case at hand, the comparators – the neonatologists employed at Carmel and the neonatologists employed at 86th Street – were *not* comparable in all material respects. The jobs of the two neonatologist groups are not fungible; although a Level IV NICU neonatologist can perform the duties of a Level II or III NICU neonatologist, the reverse is not necessarily true.

Accordingly, because Marnocha did not carry her burden on *McDonnell Douglas*'s similarly situated prong, we conclude that the district court appropriately granted summary judgment on her termination claim. Finding Marnocha did not establish a prima facie case for age discrimination in her termination claim, we do not address her arguments regarding pretext.

### B.  Failure to Hire Claim

Marnocha next alleges that she was discriminated against because St. Vincent failed to hire her. On appeal, Marnocha challenges the district court's holding that she failed to prove that St. Vincent's rationale for not hiring her was pretext for age discrimination. She argues that the court erred by discounting evidence that Rothenberg's age bias tainted the interview panel and that the interview panel was used to conceal St. Vincent's preference for Landis.

Relying again on the *McDonnell Douglas* framework, the parties agree that Marnocha established a prima facie case that she was not hired because of her age, given (1) she is a member of a protected class, (2) she applied for and was qualified for an open position, (3) despite her qualifications, she was rejected for the position, and (4) a similarly situated person outside her protected class was hired for the position. *See Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 413 (7th Cir. 2018).

Once a prima facie case is established, the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Carson*, 865 F.3d at 533 (citation and internal quotation marks omitted). Once such reasons are given, the burden "shifts back" to the plaintiff to demonstrate that "the employer's explanation is pretextual." *Id.* (citation and internal quotation marks omitted). That the "individuals ultimately hired were better candidates" is a legitimate, nondiscriminatory reason for refusing to hire a plaintiff. *Skiba*, 884 F.3d at 724. To make a showing of pretext, a plaintiff must present evidence suggesting the employer's "proffered reason … [is] a lie." *Id.* To meet this burden, plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions" in the employer's asserted "reasons that a reasonable person could find it unworthy of credence." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007).

The ADEA directs employers "to evaluate [older] employees … on their merits and not on their age." *Hazen Paper*, 507 U.S. at 611 (alteration in original) (citation and internal quotation marks omitted). In this respect, the interviewing

panel conformed to the ADEA's command. Based on the record, Landis outshone Marnocha in her interview, positioning herself as the better candidate for the 86th Street opening. She had a plan for the transition, she impressed the interviewers with her proactive research, and she brought the energy needed for the job. By contrast, Marnocha brushed off her need for training and the existence of medical advances over the last fifteen years. Like the plaintiff in *Skiba*, Marnocha "presented as somewhat over-confident regarding [her] own knowledge and abilities." 884 F.3d at 721. The record here thus supports a range of legitimate and non-age-related reasons for hiring Landis over Marnocha.

Marnocha has not shown that these legitimate, non-age-related reasons for hiring Landis are pretextual. Conduct that, standing alone, may raise questions about discrimination may turn out to be "innocuous when viewed in context." *Id.* at 720. At the center of Marnocha's pretext argument is Rothenberg's note that Marnocha was "at end of career," which he later clarified he made because he "want[ed] to build for 20, 30 years in the future, not just for the next five years." We have previously explained that the description of a plaintiff as a "later career person" is "not an inevitable euphemism for old age." *Id.* at 722 (citing *Wilson v. Lear Corp.*, 2 F. App'x. 576, 580 (7th Cir. 2001)). Rothenberg's considerations similarly must be put in context. Nothing in the record evidences that he steered the interview committee away from Marnocha; the record supports the claim that committee members independently reached their decision to hire Landis, and no interviewers affirmatively stated that Rothenberg

shared his views on Marnocha's career stage with them.[4] Fur-
thermore, seeking a "high energy person" to fill the open ne-
onatologist role, without more, does not evidence an inappro-
priate focus on age. *See Blackwell v. Cole Taylor Bank*, 152 F.3d
666, 672 (7th Cir. 1998) (noting descriptive phrases about can-
didates' "energy" levels evidence "the kind of evaluative ap-
proach that the antidiscrimination laws seek to encourage").
When looking at the record, Marnocha falls short of showing
the non-age-related reasons St. Vincent offered are "reasons
that a reasonable person could find … unworthy of credence."
*Boumehdi*, 489 F.3d at 792.

Emerging from the tangled details of this case, it is helpful
to return to the burden on Marnocha. She must prove but-for
causation; merely showing that "age was *a* motivating factor"
does not suffice. *See McDaniel*, 940 F.3d at 367 (quoting
*Wrolstad*, 911 F.3d at 454). Under this standard, Marnocha has
not carried her burden on either her termination or failure to
rehire claims. Using the appropriate comparators, the Carmel
neonatologists, the only similarly situated neonatologist un-
der forty was not treated more favorably. Instead, all were
fired and offered the identical opportunity to reapply and in-
terview for the remaining opening. Reviewing the rehiring

---

[4] On appeal, Marnocha argues that *Shrager v. Upjohn Co.*, 913 F.2d 398, 405
(7th Cir. 1990), "recognized that hiring panels may well serve as 'a liability
shield invented by lawyers' that can 'insulate the company from liability
unless there is evidence that the panel is tainted by prejudice.'" The record
does not support her claim that the panel was tainted by prejudice. There
is no evidence Rothenberg shared his long-term viewpoint, and the only
panel member who was asked about Rothenberg's views, Whitman, does
not recall any discussion to that effect.

process, the record supports St. Vincent's legitimate and non-age-related reasons for hiring Landis over Marnocha.

Although we take "a fresh look at the record," *Skiba*, 884 F.3d at 725 (quoting *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 837 (7th Cir. 2014)), Marnocha is still not entitled to relief in this case. Had Marnocha been under the age of forty, all else equal, the "same events would have transpired." *Id.* (quoting *Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009)). The evidence brought forward by Marnocha does not permit a reasonable factfinder to conclude that her age caused her termination or subsequent hiring outcome. As such, the district court's grant of summary judgment was appropriate.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of St. Vincent.